OPINION OF THE COURT
Jacqueline W. Silbermann, J.
This article 78 proceeding seeks a judgment staying the bidding and enjoining the City of New York from awarding Department of Environmental Protection No. QED-935, directing the City to delete certain portions of the contract, and directing the City to rebid the contract without the objectionable provisions. The order to show cause issued by this court on January 22, 1993 contained a temporary restraining order which stayed the bidding on the contract, which had been scheduled for January 28, 1993. Consolidated Edison Company of New York (Con Ed), New York Telephone Company (NY Tel.) and Empire City Subway Company (Empire) seek leave to intervene in this proceeding.
This court shall deal first with the motion for leave to intervene (the intervenors collectively will be called Utilities). The intervenors own and operate various utility facilities beneath the streets of the City of New York. With certain exceptions the law generally requires the Utilities to bear the *762 expense of maintaining, protecting and, if necessary, removing, relocating or replacing any utility facilities (utility work) which would otherwise prevent the City public improvement projects from going forward. In the past, this has meant that Utilities have had to negotiate with various contractors for the performance of utility work. According to the City and the Utilities, this has resulted in substantial costs and delays in City projects. In an effort to deal with the problem, the City and the Utilities entered into an agreement known as the Joint Bidding Agreement, which requires the City to include utility work in certain of its contracts, including contract QED-935, so that the City’s work and the utility work would be competitively bid as a package. Ultimately, it is the Utilities which have to pay the City for the full cost of the utility work. HHM’s petition seeks to strike down the provisions of contract QED-935 which implement the Joint Bidding Agreement.
The Joint Bidding Agreement, dated April 23, 1992, provides in substance:
(1) Utility work and City work are to be included in the same contract, and contractors competitively bid on both types of work at the same time;
(2) The City awards the construction contract to the over-all lowest bidder based on the combined total of the bids for utility work and the City work;
(3) The City administers the total contract; and
(4) The Utilities pay the City for the cost of the work but the contractors themselves (with certain narrow exceptions) look only to the City for payment.
Addendum No. 5 to the information for bidders on contract QED-935 provides that bid specifications for utility work in connection with Con Ed, NY Tel. and Empire facilities have been included in the contract, that the contractor (i.e., successful bidder) is responsible for all utility work and is paid by the City for such work based on the prices bid, that the contractor is not to seek any further compensation from the utility companies except for certain items expressly contained in the contract, and that the Utilities are to fund the cost of the utility work under an agreement between them and the City. The addendum further states that the utility companies are third-party beneficiaries of the contract for all work performed by the contractor which affects utility facilities within the project area.
*763 CPLR 1012 (a) (1) provides that intervention is permitted when a statute confers a right to intervene. CPLR 7802 (c) in turn provides that "[w]here the proceeding is brought to restrain a body or officer from proceeding without or in excess of jurisdiction in favor of another, the latter shall be joined as a party.” Moreover, CPLR 1001 (a) states that persons who might be inequitably affected by a judgment made in the action should be joined as parties. For example, in Matter of Martin v Ronan (47 NY2d 486 [1979]), where a group of unsuccessful candidates on a civil service promotional examination challenged the results, it was held that the successful candidates, who potentially stood to lose their advantageous positions if the challenge were upheld, were entitled to be parties to the proceeding. In the instant case, the petition does not directly attack the Joint Bidding Agreement itself, under which the Utilities are designated as third-party beneficiaries. However, the net effect of a court decision prohibiting the method of bidding called for by contract QED-935 would be to render it impossible for the City to enter into public works contracts implementing the provisions of the Joint Bidding Agreement. Thus, the Utilities have a direct interest in the outcome of the instant proceeding. Accordingly, the motion to intervene is granted.
Before reaching the merits of the dispute, this court must consider two threshold issues raised by the Utilities. First, the Utilities maintain that the action is barred by the four-month Statute of Limitations on article 78 proceedings (CPLR 217). According to the Utilities, the four months accrued on April 23, 1992, when the Joint Bidding Agreement was executed. This, however, is not the proper accrual date. First, it was not until the City solicited bids for QED-935 that petitioner had a grievance. Moreover, it is axiomatic that the Statute of Limitations does not begin to accrue until the aggrieved party receives notice of the adverse determination; no such notice was given here. Thus, the instant petition is not barred by the Statute of Limitations.
The Utilities’ second threshold argument is that petitioner lacks standing to maintain the instant proceeding. Petitioner has not unequivocally indicated an intention to bid on contract QED-935 and respondents maintain that any claim of potential harm to petitioner is speculative. However, an examination of the relevant case law indicates that petitioner clearly has standing to maintain the proceeding. In Elia Bldg. Co. v New York State Urban Dev. Corp. (54 AD2d *764 337 [4th Dept 1976]) the Court held that standing would attach not only to unsuccessful bidders but also to those claiming that the statutory violations effectively prevented them from submitting any bids at all. Moreover, in Matter of Jerkens Truck & Equip. v City of Yonkers (174 AD2d 127 [2d Dept 1992] [where an unsuccessful bidder was held to have standing to challenge a contract award on the grounds that the successful party had not submitted a bid in conformity with the requirements of the invitation to bid and had improperly engaged in postbid negotiations with the municipality]), the Court pointed out that although competitive bidding statutes were enacted for the protection of the public rather than for the enrichment of the potential bidders, a process which treats bidders unfairly can adversely affect the public in that these bidders will be discouraged from entering into bidding on future projects. As a result, competition would be lessened and higher prices may occur on municipal projects. In light of the potential adverse effect upon petitioner of contract QED-935 and in light of strong policy considerations behind the protection of the competitive bidding process, this court holds that petitioner has standing to maintain the instant proceeding.
According to the City and the Utilities the Joint Bidding Agreement came about because it is more efficient to have the same contractor perform both the City public works project and the utility work. In the past, in arranging for the performance of utility work incident to a City public works project, the Utilities have been required to negotiate with the same contractor previously chosen by the City, without the protection of competitive bids from other contractors. Thus, according to the City and the Utilities, prices to the Utilities and delays on the public project have risen substantially. The City maintains that the Joint Bidding Agreement both reduces the problems faced by the Utilities and helps the City by providing more efficient administration of contracts. This court, however, has no power to pass upon the wisdom of the City’s new bidding policy but must determine its legality. Petitioner’s challenge to QED-935 has two main aspects: that the contract represents an improper shifting from the Utilities to the contractor of the responsibility for maintaining the utility facilities, and that the QED-935 unlawfully permits the awarding of contracts to contractors other than the lowest responsible bidder. Administrative Code of the City of New York § 24-521 provides in part that where there is a public works *765 project, any utility corporation whose pipes, mains or conduits are about to be disturbed by the work are obligated to remove or otherwise protect and replace their pipes, mains and conduits, and all connecting fixtures or appliances, where necessary, under the direction of the City. Petitioner then points to certain portions of QED-935 which allegedly violate the statute. Attachment No. 2 of addendum No. 8 to QED-935 provides in relevant part: "The contractor is responsible for all Utility Work for the affected Utility Facilities and shall be paid by the City for such work * * * the contractor shall not seek any compensation from the utility companies * * * [and] agrees to waive any right it may have, if any, under law, contract or otherwise to compel (or to compel the City to assert any right the City may have to require) * * * the utility companies to maintain, repair, replace, protect, support, shift, alter, relocate and/or remove utility facilities in connection with the work to be performed.”
Attachment No. 3 to addendum No. 8 provides that: "All interference work * * * for * * * Utility Facilities shall be paid for solely by the City. Contractor hereby agrees that the utility companies shall not be liable to pay it for any work performed * * * The method of performing utility work shall be subject to the City approval.”
Administrative Code § 24-521 is essentially an extension of the common-law rule respecting utility interference work: that the utility company must relocate its facilities at its own expense when public necessity comes into play (see, e.g., Matter of Consolidated Edison v Lindsay, 24 NY2d 309 [1969]). In a number of cases, however, courts have found the inclusion of utility interference work in a public works contract not to be prohibited by the common-law rule (see, e.g., Bethpage Water Dist. v Hendrickson Bros., 138 AD2d 660 [2d Dept 1988]; Lizza Indus. v Long Is. Light. Co., 44 AD2d 681 [2d Dept 1974], appeal dismissed 36 NY2d 754). It is true, as petitioner points out, that Bethpage and Lizza involved contracts by local governments other than the City of New York, so that the Administrative Code did not apply. However, Grace & Sons v New York Tel. Co. (Sup Ct, NY County, Fraiman, J., index No. 9519-77, affd without opn 86 AD2d 986 [1st Dept 1982]) did involve a public works contract within the City of New York, albeit a State contract rather than a City contract. In that case, contractors sought to be reimbursed by utilities for performing certain utility interference work which was included in the contractors’ contract with the New York State *766 Department of Transportation. Specifically, the contractors maintained that despite the language of the contract, the Administrative Code and common law precluded the governmental entity from requiring the contractor to perform the utility interference work. The court, however, ruled as follows: "The foregoing provisions [of the Administrative Code] do not supersede the express terms of the contract, which provides to the contrary.”
In Paterno & Sons v Jamaica Water Supply Co. (52 AD2d 595 [2d Dept 1976]) the plaintiff had contracted with the City of New York for the construction of sewers, and as in the instant case, upon the completion of the job the contractor sued the utility for the costs of relocating and protecting its facilities. The Paterno Court held that under the terms of its contract with the City, the contractor was not responsible for such costs and found for the plaintiff contractor. In so holding, however, it reaffirmed its determination in the Lizza case (supra) distinguishing it only on the basis that in Lizza the contract specifically placed on the contractor the duty of maintaining and protecting the mains and conduits of the utilities. Thus, the clear implication of Paterno is that notwithstanding the fact that the contract there was with the City, and the Administrative Code was applicable thereto, the Court would nevertheless have followed the Lizza decision if the contract had placed the responsibility of protecting the utility structures on the contractor.
Petitioner complains that QED-935 requires it to waive its rights to sue the utility in connection with the interference work. However, there is nothing in the law which prohibits such a contractual provision. In light of Lizza (supra), Beth-page (supra) and Grace (supra), this court holds that QED-935 does not violate either the common-law rule or Administrative Code provisions regarding utility interference work.
The second and more substantial aspect of petitioner’s challenge is that QED-935 violates statutes requiring the awarding of contracts to the lowest responsible bidder.
Section 100-a of the General Municipal Law, entitled "Declaration of Policy”, states that "[i]t is hereby declared to be the policy of this state that this article shall be construed in the negotiation of contracts for public works * * * so as to assure the prudent and economical use of public moneys for the benefit of all the inhabitants of the state and to facilitate the acquisition of facilities and commodities of maximum quality at the lowest possible cost.”
*767 Section 103 (1) of the General Municipal Law provides that "[e]xcept as otherwise expressly provided by an act of the legislature or by a local law adopted prior to [September 1, 1953], all contracts for public work involving an expenditure of more than twenty thousand dollars * * * shall be awarded * * * to the lowest responsible bidder.”
Essentially, petitioner maintains that by including bid prices for private utility work on a public contract, the City is not bidding the public work in a manner to guarantee that it will receive the lowest possible cost for the performance of the public work. For example, assume that contractor A bids $20 million to perform the public work and $10 million to perform the private utility interference work, for a total bid of $30 million, and that contractor B bids $21 million to perform the public work but only $8 million to perform the utility work. The City would be required to accept the $29 million bid of contractor B as the lowest responsible bidder, even though A’s bid was $1 million less than B’s bid with respect to the public portion of the work (i.e., the portion paid for with taxpayers’ money). As a result, petitioner maintains, the Utilities could well benefit at the taxpayers’ expense, particularly because the Joint Bidding Agreement contemplates that the City will consult with the Utilities with respect to bids. The City points out that although the Utilities may consult with the City, it is the City which has the ultimate responsibility to make the decision with respect to the bidding process, and that in any event, the City has a right to reject any and all bids if the lowest bid still results in excessive expense for the City. However, here is no question that the Joint Bidding Agreement might well result in a violation of the "lowest responsible bidder” rule.
Respondents maintain that there is a pre-1953 local law which constitutes an exception to the "lowest responsible bidder” rule within the meaning of the statute.
The current section 313 (b) (2) of the New York City Charter provides in pertinent part: "The agency letting the contract may reject all bids if it shall deem it for the interest of the city so to do; if not, it shall, without other consent or approval, award the contract to the lowest responsible bidder, unless the mayor shall determine in writing, justifying the reasons therefor, that it is in the best interest of the city that a bid other than that of the lowest responsible bidder shall be accepted. Such determination shall be filed with the procurement policy board and published in the City Record.”
*768 Respondents claim that the relevant current Charter provision is a mere restatement of previous Charter provisions dating back to the City Charter that was enacted by the New York State Legislature in 1897. Section 419 of the 1897 Greater New York Charter (L 1897, ch 378, § 419) provided as follows: "[a]ll contracts [over $1,000] shall * * * be founded on sealed bids or proposals * * * duly advertised in the 'City Record,’ and the corporation newspapers * * * if the head of a department shall not deem it for the interests of the city to reject all bids, he shall, without the consent or approval of any other department or officer of the city government, award the contract to the lowest bidder, unless the board of public improvements by a vote of majority of its members, of whom the mayor and the comptroller should be two, shall determine that it is for the public interest that a bid other than the lowest should be accepted.”
Subsequently, the power to award contracts to other than the lowest bidder was given to the New York City Board of Estimate. Former section 343 (b) of the New York City Charter, enacted in 1938, provided as follows: "The agency letting the contract may reject all bids if it shall deem it for the interest of the city so to do; if not, it shall, without other consent or approval, award the contract to the lowest responsible bidder, unless the board of estimate by a two-thirds vote shall determine that it is for the public interest that a bidder other than that of the lowest responsible bidder shall be accepted.”
In support of its claim that the relevant current portions of the New York City Charter are a mere recodification of the old portions of the Charter, respondents cite United States v City of New York (799 F Supp 1308 [ED NY 1992]). In that case, the court held that current section 312 of the New York City Charter was a restatement of a pre-1953 Charter provision within the meaning of section 103 of the General Municipal Law. The question in that case was whether a contract for sludge management had to be awarded by public competitive bidding pursuant to section 103 of the General Municipal Law, and the court answered the question in the negative. Petitioner maintains that the instant case is different in that the question is not whether the contract is to be competitively bid (competitive bidding clearly is required here) but whether the contract must be awarded to the lowest responsible bidder. This court, however, determines that for purposes of the issue *769 involved in this case, New York City Charter §§ 312 and 313 are closely analogous to each other.
Petitioner maintains that the current provision of the New York City Charter represents a significant departure from prior law. Under the 1897 Charter, decisions to award a contract to other than the lowest bidder were made by a public improvement board, and under the 1938 law, such decisions were made by the Board of Estimate. In other words, a group of elected officials had to be involved in the decision, so that there would be checks and balances, while under the new provision of the New York City Charter the entire relevant power is in the hands of the Mayor which eliminates the checks and balances. A close comparison of the 1897, 1938 and current Charter provision, however, shows that they are based on the same principle: under certain conditions, the municipality is empowered to waive the "lowest bidder” rule.
Although the decision is now made by the Mayor rather than by a group of officials, the decision process is not free from scrutiny. The Mayor must nevertheless publish in the City Record a written explanation of the decision to award the contract to anyone other than the lowest responsible bidder. In the instant case, the City maintains that the Joint Bidding Agreement, which was executed by Rudolph Rinaldi, the Director of the Mayor’s Office of Construction, constitutes a determination of the Mayor that it is in the interest of the City to bypass, if necessary, the lowest responsible bidder. Page 2 of the Joint Bidding Agreement states: "whereas the City and the Companies [Utilities] believe that the costs to each will be reduced, that the performance of the City work will be expedited, that delays will be minimized and that the public safety and convenience will be served best by having the parties cooperate in pre-engineering projects * * * involving Interference Work and by the inclusion of certain work relating to * * * utility facilities in the contracts between the City and the City contractors.”
The City apparently intends to use the above language as authority to bypass the "lowest responsible bidder” rule on any contract involving a combination of public work and utility interference work. However, this is not the intent of the law. Only after the bids have been submitted on a particular contract can the Mayor determine whether or not it is in the interest of the City to accept a particular bid. Thus, if the lowest responsible bidder on the public portion of the work differs from the lowest responsible bidder on the package (City *770 work plus utility work), the City must do either of two things: (1) reject all bids and call for resubmission of bids until the lowest bidder on the package project is also the lowest bidder on the public portion of the work; or (2) the Mayor must file with the Procurement Policy Board and publish in the City Record a written explanation of why the City accepted a bid even though another bid contained a lower price for the public portion of the work (the cost of which is borne by taxpayers). In the event that the City fails to comply with any of the above, the petitioner would have grounds to renew this proceeding.
Accordingly, the petition is denied, and the temporary restraining order heretofore issued by this court is vacated. Petitioner, however, shall have leave to renew this proceeding in the event that the City awards contract No. QED-935 to anyone other than the lowest bidder on the City work without complying with section 313 (b) (2) of the New York City Charter.