OPINION OF THE COURT
Louis B. York, J.
Creole Enterprises, Inc., a collective interested in purchasing the WNYC AM and FM radio stations (collectively referred to as WNYC), initiated this CPLR article 78 proceeding to challenge the decision of respondents Rudolph Giuliani, the Mayor of New York City, and Mark Bandak, an assistant vice-president of the New York City Economic Development Corporation[1] (collectively referred to as the City), to sell WNYC to the WNYC Foundation (the Foundation). According to petitioner, the proposed sale should not go forward because city law requires the City to make the stations available for sale through a public bidding process. W. Tisch, chairperson of the Foundation, and John O. Platt, captioned as the director of marketing of the WNYC Communications Group,[2] are also named as respondents.
BACKGROUND
In 1922, the Board of Estimate and Apportionment authorized the construction, maintenance, and operation of the first City-held station, which originally served as " 'an adjunct to the Police and Fire Departments and such other departments *813 as may require or use such service.’ ” (Fletcher v Hylan, 125 Misc 489, 490 [Sup Ct, NY County 1925].) The Legislature’s power to authorize the establishment of the radio station stemmed from several sources: General City Law § 20 (16), which empowers cities "[t]o establish and maintain such institutions and instrumentalities for the instruction, enlightenment, improvement, entertainment, recreation, and welfare of its inhabitants as it may deem appropriate or necessary for the public interest or advantage”; section 1175 of the Greater New York Charter (L 1901, ch 466), which provided that, as it deemed necessary or useful to the public, the Board of Health could establish regulations that allowed for the publicizing of Health Board reports and proceedings; and other similar Charter provisions authorizing City departments to disseminate information to the public. (See, Fletcher v Hylan, 125 Misc, at 491, supra.)
The radio station grew beyond this expressed purpose, broadcasting music; airing discussions on health, the economy, and other subjects of educational value; and "diffusing] * * * opinions on matters more or less connected with the civic and political questions of the hour.” (Supra, at 490.) When a challenge was raised to this broader use of the station, a Justice of this court held that "the use of city property for other than a proper 'city purpose’ ” was impermissible and enjoined the use of the station for political utterances or any political purpose. (Fletcher v Hylan, 211 NYS 727, 730 [Sup Ct 1925]).
Following this ruling, pursuant to Local Laws, 1930, No. 5 of the City of New York, the local Legislature enacted Administrative Code of the City of New York § 683-1.0, which stated that the radio station could function not only as an adjunct to any municipal agency requiring its services, but as a tool "for the instruction, enlightenment, entertainment, recreation and welfare of the inhabitants of the city by the broadcast of any matters which are deemed appropriate and necessary for the public interest and advantage.” Section 1 of Local Laws, No. 5 defined matters which may enrich the public as: "[N]ational, state and municipal public celebrations and functions; memorial services in commemoration of events of public importance, or in honor of individuals or classes of individuals who have greatly benefited the nation, state or municipality by their accomplishments or sacrifices; the reception and entertainment of distinguished visitors representing some foreign nation or coming upon some public mission; the welcome and entertainment of soldiers or sailors returning from war, of distinguished *814 citizens returning from the diplomatic service of the United States or from the service of the state or municipality abroad, and of citizens returning from athletic or other competitions; lectures and addresses on educational, literary, musical, scientific and like matters and subjects; band, orchestral, instrumental or vocal concerts and entertainments; the reception and entertainment of national, state and municipal officers and officials; addresses delivered on current affairs and topics of general importance and interest; entertainments and functions of civic bodies and organizations such as chambers of commerce, boards of trade, civic forums, community centers, and associations and societies of members and employees of any of the city departments, boards and offices and other like bodies.” Thus, the Legislature made it clear that the City had a great deal of discretion to develop the radio station as it deemed appropriate. Accordingly, a subsequent challenge to the use of WNYC for the broadcast of the proceedings of the Holy Name Society was dismissed. (See, Lewis v LaGuardia, 172 Misc 82 [Sup Ct, NY County 1939], affd 258 App Div 713 [1st Dept 1939], affd 282 NY 757 [1940].)
Over the years, WNYC AM and FM have evolved to rank among "the country’s most prolific national producing stations.” (Affidavit of Peter Darrow, President, WNYC Foundation.) In addition to news programs and National Public Radio programming, the stations air programs such as "Selected Shorts”, which features actors reading from the works of established fiction writers; "The Frick Collection Concert Series”, from the renowned art museum; and "New York Kids”, which involves students from City schools in its production and presentation.
During this time, the WNYC stations have increasingly come under the management and control of the Foundation. According to Peter Darrow, its president, the Foundation was established in 1979 to assume some financial responsibility for the radio and television stations during the City’s fiscal crisis. Between 1979 and 1995, the Foundation’s responsibility for and financial support of the stations has grown, and the City’s financial support of the station has decreased from over 90% to under 10%.
Recently, the City decided to sell the WNYC radio and television stations to raise funds for the City and to free itself from the administrative and fiscal burdens of operating the station. Initially, it considered selling the radio stations to commercial buyers. Ultimately, however, it decided to sell the *815 stations to the Foundation. The City "recognized the importance of the WNYC radio stations as New York City cultural institutions” and concluded that a deal with the Foundation, which would ensure the preservation of the unique character of the stations, was in the best interest of the people of New York City. In March of 1995, the City publicly announced its intention to sell the radio stations to the Foundation for $20 million, to be paid out over a period of six years. In addition, in its background brief, the Foundation outlined the proposed package for sale and explained the benefits of the sale. From May 31, 1995 through June 3, 1995, the Foundation planned to conduct an intensified on-the-air drive to raise some of the $3 million needed for the stations’ down payment.
After hearing of the proposed sale, and learning that the Foundation intended to hold a fund-raising drive, petitioner instituted this proceeding. It alleged that the proposed transfer violated express provisions of the New York City Charter because the City planned neither to conduct competitive bidding nor to hold a public hearing. The fund-raising drive, according to petitioner, was also improper because it constituted an attempt to raise funds to enable the Foundation to consummate the illegal agreement. Petitioner, as a prospective buyer, stated that it would be irreparably harmed by the fund-raising drive as well as by the proposed sale. Accordingly, petitioner originally asked this court to (1) enjoin the proposed sale, (2) order the City to comply with the alleged public bidding requirement, and (3) enjoin the Foundation from engaging in a public fund-raising drive to raise the money needed to purchase the WNYC stations. Although petitioner’s order to show cause only discussed its desire to purchase the AM radio station, on its face the order to show cause applied to the television station and the FM station as well.
In a hearing on May 31, 1995, I refused to enjoin the Foundation’s fund-raising activities and set the matter down for a hearing on July 13, 1995 on the preliminary injunction.[3] Respondents represented to the court that they would not go forward with the sale until a decision had been handed down. In addition, petitioner clarified that it was only interested in purchasing the radio stations — and, accordingly, orally withdrew the petition as it related to the television stations.
Before the court, then, are the following: petitioner’s motion for summary judgment on its article 78 challenge; and the City *816 respondents’ cross motion to dismiss the proceeding, in which the other respondents join. As the WNYC radio stations have not yet been sold, petitioner can only challenge the decision to sell without competitive bidding, and the method in which the City has decided to sell the station.
Finally, Dominicana Internacional applied to intervene in the proceeding as a petitioner. All respondents opposed the application. For the reasons stated at oral argument, which are a part of the court record, that application has already been denied.
THRESHOLD ISSUES
The City raises two threshold challenges to the proceeding which must be addressed first. The City points out that petitioner failed to properly initiate this proceeding by annexing a petition to its order to show cause. Instead, it annexed the affidavit of Jean Fritz Marshall, president and chief executive officer of petitioner (the Marshall affidavit); and the affirmation of Roy Smith, attorney for petitioner (the Smith affirmation). Although the City is'correct, this technical defect is not fatal. The order to show cause states that petitioner seeks article 78 relief; and the Marshall affidavit and the Smith affirmation adequately set forth petitioner’s article 78 claim. Thus, respondents received adequate notice of the issues involved and suffered no prejudice. Accordingly, the court exercises its discretion and deems the proceeding properly commenced. (See, Servatius v Town of Verona, 124 Misc 2d 848, 849 [Sup Ct, Oneida County 1984], affd 112 AD2d 706 [4th Dept 1985].)
The City’s other preliminary arguments relate to standing. The City asserts that petitioner claims to be interested in purchasing the AM station alone and therefore has no standing to challenge the sale of the FM station. However, at oral argument petitioner’s attorney stated that petitioner would like to be able to bid on both the AM and the FM radio stations. Therefore this argument is moot and petitioner has standing. (See, Matter of Barnes v Binghamton Urban Renewal Agency, 127 Misc 2d 859, 862 [Sup Ct, Broome County 1985] [party claiming that improper procedure denied him opportunity to be lowest bidder on public works contract had standing to challenge procedure].) Furthermore, although petitioner may have been equivocal on this point, in Matter of HHM Assocs. v Appleton (157 Misc 2d 759, 763-764 [Sup Ct, NY County 1993]) the Supreme Court of this county held that *817 a petitioner who "ha[d] not unequivocally indicated an intention to bid” on a utility works contract nonetheless had standing to assert an article 78 claim "[i]n light of the potential adverse effect upon petitioner” and the policy considerations involved. This principle applies with equal force here.
In addition, the City states that petitioner has no standing to challenge the sale of the AM station because the station carries a noncommercial license and petitioner is a commercial purchaser.[4] This argument must also fail. As the papers annexed to petitioner’s order to show cause reveal, the City initially considered selling the radio stations to commercial buyers; and, as Corporation Counsel acknowledged at oral argument, once a commercial buyer purchased the radio station it could apply to the Federal Communications Commission (FCC) to change from a commercial to a noncommercial license. Thus, the nature of the license would not have been an obstacle to the sale of the radio stations to commercial buyers; and, accordingly, it does not prevent petitioner from bringing this proceeding. As the City initially contemplated selling to a commercial buyer, the court finds Corporation Counsel’s arguments on this point somewhat disingenuous.
The City finally argues that petitioner has no standing to commence a taxpayer action, as (1) it fails to allege that it is a real property owner and taxpayer and (2) it failed to file a bond when it commenced this proceeding. Under General Municipal Law § 51, these are prerequisites to commencing a taxpayer action. However, petitioner has not argued that this is a taxpayer action; the City raised this argument to preempt petitioner from doing so if the court found this proceeding defective under article 78. As petitioner has continued to characterize this as an article 78 proceeding and has made no attempt to bring it within the purview of General Municipal Law § 51, the argument has no relevance to this case.
THE city’s POWER TO SELL PROPERTY
According to petitioner, the City cannot simply decide to sell the WNYC radio stations to the Foundation. Instead, it claims, the City must put the stations up for sale through a competitive bidding process. The basis for petitioner’s argument is New York City Charter § 384 (b) (1), which provides that the City must sell real property through competitive bidding. Al *818 though the radio stations do not constitute real property, petitioner states, the City is trustee of the personal as well as the real property it owns. Therefore, the requirement implicitly applies to the City’s other property as well.
Under General City Law § 20 (2), a city has the power not only to "take, purchase, hold and lease real and personal property” but "to sell and convey the same.” Because the City can "acquire and * * * hold personal property * * * for its corporate purposes * * * it has the authority to dispose of it in the public interest, under such restrictions as may be prescribed by its governing body.” (See, 1969 Opns St Comp No. 68-109 [discussing another city’s power under the General City Law].) Furthermore, as the chief executive officer of the City, the Mayor has the power to sell City property. (See, NY City Charter §§ 3, 8; Matter of Bauch v City of New York, 21 NY2d 599, 605 [1968], cert denied 393 US 834 [1968].)
Competitive bidding provisions in statutes, charters, and ordinances modify this general rule in certain instances. The purposes of competitive bidding provisions are to "invit[e] competition, to guard against favoritism, improvidence, extravagance, fraud, and corruption, and to secure the best work or supplies at the lowest price practicable.” (10 McQuillin, Municipal Corporations § 29.29 [3d ed 1990]; see, Matter of Citiwide News, 62 NY2d 464, 472 [1984].) However, because competitive bidding requirements substantially restrict the activities of muncipalities, courts strictly construe these laws, refusing to extend them beyond their stated purpose. (Matter of AT/ Comm v Tufo, 86 NY2d 1, 6 [1995]; Matter of Citiwide News, 62 NY2d, at 472, supra,)[5] Because New York City Charter § 384 does not directly apply to the sale of the WNYC radio stations or to the property of the City in a general sense, this court will not read it as imposing a competitive bidding requirement in this case. Neither General Municipal Law § 103, which imposes a competitive bidding requirement for public works contracts, nor any other competitive bidding provision found by the court, applies to the type of transaction involved here. Therefore, there is no competitive bidding requirement.[6]
Petitioner alleges that the individual City respondents represented that the stations were to be sold through a bidding *819 process, stated that City law required this process, and indicated that public hearings were to be held regarding the sale of the station. Petitioner argues that a trial is necessary to determine whether City employees made these representations and whether a public hearing was held regarding the proposed sale of the radio station. (See, CPLR 7804 [h].) These questions are irrelevant to the issue before this court, and no hearing is necessary. First, as there is no statutory right to hold a public hearing in this instance, the decision is entirely within the discretion of the City. (See, Matter of Lubkemeier v City of New York, 79 Misc 2d 786, 787-788 [Sup Ct, NY County 1974] [dismissing challenge based on inadequate notice of hearing where no hearing was required].) Second, any incorrect representation made by a City official indicating that there was a public bidding requirement would not be binding on the City. (See, 2550 Olinville Ave. v Crotty, 185 AD2d 200 [1st Dept 1992], lv dismissed 81 NY2d 772 [1993].) Because competitive bidding laws exist for the protection of the public and not of the prospective bidders (Matter of Signacon Controls v Mulroy, 32 NY2d 410, 414 [1973]), it would be particularly inappropriate to consider an estoppel-based argument in this situation.
OTHER CHALLENGES
Petitioner’s primary argument is set forth above. In addition, it appears to challenge the proposed sale as arbitrary and capricious. This challenge also has no merit.
Annexed to the petition is the affidavit of Donald Lewis, president and chief executive officer of Cosmopolitan Broadcasting Company (annexed to petitioners’ reply papers). According to Mr. Lewis, Cosmopolitan has agreed to "support” petitioner’s attempt to purchase the radio stations. Mr. Lewis states that petitioner is prepared to offer the City $30 million for the WNYC stations and WNYE-FM a City-held educational station.[7] This is $10 million more than the Foundation has agreed to pay. Arguably, the City’s failure to seek the highest possible price renders its decision irrational.
In addition, petitioner implicitly questions whether the Foundation is a more appropriate licensee. The Lewis affidavit asserts that Mr. Lewis intends to retain the current classical music and talk radio components of the WNYC stations’ programming, and to add a "third format on behalf of * * * *820 foreign language speakers” living in New York City. (Lewis affidavit ¶ 3.) Furthermore, Mr. Lewis states that he would retain the current WNYC staff. Therefore, the implication is, the station will continue to serve the City even if sold to petitioner.
Even if the statements of Mr. Lewis — a nonparty who states that he "supports” petitioner’s efforts to buy the WNYC radio stations but does not make his relationship to petitioner clear — regarding his programming goals for the WNYC stations were not conclusory and otherwise unpersuasive, the court would not consider them. It is not dispositive that petitioner’s offering price may be greater than the sale price. Absent a competitive bidding requirement, a city or agency has a fiduciary duty to sell property in the public interest. Although often this means getting the best price (see, Matter of Ross v Wilson, 308 NY 605, 612 [1955]), other factors are appropriately considered. (E.g., Matter of Mathalia Motors v City of Oneida, 105 Misc 2d 843, 844 [Sup Ct, Madison County 1980] [dismissing challenge to award of towing contract] [citing 10 McQuillin, Municipal Corporations § 29.73a (2d ed 1966)], affd 84 AD2d 637 [2d Dept 1981].)
In deciding to sell the WNYC radio stations to the Foundation, the City considered many factors in addition to the monetary value of the stations. The WNYC radio stations are run by the City pursuant to laws which vest the City with tremendous power and discretion. (See, supra, at 813-814.) Over the years the City has developed the stations into cultural institutions; and in selling them the City desires to guarantee that they retain their unique character and value. In light of its goal, the City chose to negotiate privately with the Foundation, the nonprofit organization currently involved in running the WNYC stations and committed to continuing the exact mix of programming which has made the WNYC stations so valuable to the City. By making this choice, the City did not act in an arbitrary and capricious manner.
To the extent that petitioner is asking this court to go beyond this analysis and evaluate it as a potential buyer, it is asking the court to usurp the decision-making power vested in the Mayor and in the City. This, quite simply, is impermissible. (See, Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo, 64 NY2d 233, 239 [1984]; Matter of Lorie C., 49 NY2d 161, 171 [1980].) Unless the action is illegal, fraudulent, or irrational, "the manner by which * * * [a governing body] addresses complex societal and governmental issues is a subject left to the discretion of the legislative and *821 executive branches of our tripartite system.” (Klostermann v Cuomo, 61 NY2d 525, 535 [1984] [in context of justiciability analysis]; see also, Matter of Lubkemeier v City of New York, 79 Misc 2d, at 788, supra [as Board of Estimate had authority to sell city jail, its decision would not be overturned by court "in the absence of a clear demonstration of fraud, corruption or bad faith”].)
Finally, petitioner suggests that the proposed sale violates 47 CFR 73.1150 (a) because it requires the Foundation to provide free air time to the City for public service announcements.[8] The FCC provision prohibits the holder of a license from retaining any reversionary or other rights in the license when it transfers the license. (Id.) This issue is prematurely raised, as there is no signed agreement yet; in addition, petitioner improperly raises this argument for the first time in its reply papers. Furthermore, if petitioner wishes to assert a challenge to the proposed sale based on FCC regulations, it must go to the FCC with its arguments. (See generally, Federal Communications Commn. v Allentown Broadcasting Corp., 349 US 358 [1955].) The court notes, however, that the proposed contract between the City and the Foundation, which is annexed to petitioner’s order to show cause, does not contain any provisions regarding free air time.
The court has considered all of petitioner’s other allegations and has found them to be of no merit.
For the reasons stated above, the petition is dismissed. As the petition is dismissed, petitioner’s motion for preliminary injunction is denied.
In conclusion, the court emphasizes that this type of decision is appropriately left in the hands of the City. Although courts ensure that municipalities do not violate any laws in their actions, the judiciary defers to the discretionary powers of the cities. In fact, courts view City contracts with "a presumption of regularity.” (Matter of District Council No. 9 v Metropolitan Tr. Auth., 115 Misc 2d 810, 814 [Sup Ct, NY County 1982]; see, 10 McQuillin, Municipal Corporations § 28.47.) A contrary policy "would in effect attempt displacement, or at least overview by the courts and the plaintiffs in litigations, of the lawful acts of the appointive and elective officials charged with *822 the management of the public enterprises.” (Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992; see also, James v Board of Educ., 42 NY2d 357, 368 [1977] [citing Matter of Abrams v New York City Tr. Auth.])

. The respondents point out that Mr. Bandak’s name is misspelled in the caption, and that he is an assistant vice-president of the New York City Economic Development Corporation rather than its director.

. According to respondents, John O. Platt is not an employee of the WNYC Communications Group but of the Foundation.

. At the request of the parties, the hearing was adjourned to July 18, 1995.

. Petitioner incorrectly construed this as an argument that the license had no monetary value.

. Even where competitive bidding is required, the requirement can be bypassed if it is in the public interest. (See, e.g., NY City Charter §§ 317 [procurement of goods, services or construction], 384 [4] [sale of real property]; Matter of 4M Holding Co. v Diamante, 215 AD2d 383 [2d Dept 1995].)

. However, the City may have to obtain approval before the final sale. (Cf., 10 McQuillin, Municipal Corporations § 28.38 [property devoted to pub- *819 lie use cannot be sold or disposed of without specific statutory or Charter authority, or city council approval].)

. The court notes that the City is not selling. WNYE-FM.

. Petitioner also suggests that respondents’ representations about the proposed agreement have been fraudulent. The court disregards this serious yet wholly unsubstantiated allegation. (See, United States Asphalt Ref. Co. v Comptior Natl. D’Escompte De Paris, 166 App Div 64, 67-68 [1st Dept 1915], affd 221 NY 540 [1917].)