OPINION OF THE COURT
Helen E. Freedman, J.
These two CPLR article 78 proceedings, which raise identical issues of law, are consolidated for joint determination.[1]
Petitioners are unsuccessful bidders for street repair and reconstruction contracts with the City of New York Department of Transportation (DOT). They seek an order annulling the award by the municipal respondents[2] (collectively, the City respondents) of the contracts to other businesses, and directing *882 the City to award the contracts to petitioners, on the ground that the City’s bid selection procedure violates General Municipal Law § 103 (1), which governs the award of public works contracts.[3] Consolidated Edison Co. of New York, New York Telephone Company and Empire City Subway Co. (collectively, the Utilities) move to intervene in these proceedings.
Facts
Under the bidding procedure for the contracts at issue, the City respondents required that joint bids be submitted for (1) the project work for the City (the City Work) and (2) ancillary work for the Utilities, whose underground pipes, cables, wires and other privately owned facilities lie in the path of the City’s proposed construction (the Utility Work). The Utility Work involves protecting or relocating the Utilities’ facilities when necessary to perform the City Work. Both the City Work and the Utility Work for each project are governed by a single contract between the contractor and the City; under the contract, the City pays the contractor for both the City Work and the Utility Work. In a public works bid package distributed to prospective bidders, including petitioners, the City included a "Special Notice to Bidders”, which advised bidders that the Utility Work was included in the contract, that the contractor would be paid by the City for the Utility Work, and that "the Utilities] shall fund the cost of the Utility Work under an agreement between them and the City.”[4]
The agreement referred to above (the Joint Bidding Agreement or JBA), dated April 23, 1992, sets forth the joint bidding arrangement at issue here. The JBA applies to DOT and Department of Environmental Protection (DEP) projects for the construction, improvement and repair of roads and other *883 thoroughfares and sewers, culverts, water mains, etc. Its salient provisions are as follows:
The Joint Bidding Agreement provides that Utility Work to be performed by the City Work contractor will be included in the City’s project contract (the project contract). The city will require bidders for a project contract to submit joint bids for the Utility Work and the City Work. The JBA further provides that: "The City shall, consistent with its policy for letting construction contracts, award its construction contract to the lowest responsible bidder, based upon the total of each bid made for all work, including the Utility Work, to be performed under the [project] contract. The City and the [Utilities] agree that the priced [sic] bid by the City contractor should reflect an equitable distribution of costs for work to be performed on behalf of the parties and that excessive and unbalanced bids are to be avoided. The City agrees to consult with the [Utilities] as to what constitutes an excessive or unbalanced bid and as to what action the City, in its discretion, should take in the event of the submission of an excessive or unbalanced bid.” (Art 3, B.) The City is to administer the project contract on behalf of itself and the Utilities. The project contractors will look solely to the City for payment for the Utility Work. The Utilities agree to reimburse the City for the cost of the Utility Work, plus the cost of any extra Utility Work required during the course of the project and a pro rata share of certain incidental costs, and also to pay the City a 5% surcharge as an administrative fee.
As required by the City, each petitioner submitted a sealed bid which apportioned the contract price between the City Work and the Utility Work. The petitioners submitted the lowest bids for the City Work portion of each project contract, but their aggregate contract bids for the City Work and the Utility Work exceeded other companies’ aggregate bids for the contracts.
After reviewing the submitted bids, the City awarded the contracts to each of the lowest aggregate bidders for the contracts.[5] City Chief Procurement Officer Richard M. Bonamarte sent petitioners letters dated June 14, 1996 with respect to each contract, stating that, under Mayor Giuliani’s authority and pursuant to New York City Charter § 313 (b) (2) and *884 Procurement Policy Board rules, he had determined that it was "in the best interest of the City” to award the contract to "the overall lowest responsive and responsible bidder for the combined City and Utility [Work]”. Bonamarte acknowledged to each petitioner that "the price allocated by [the successful bidder] to the [City Work] is greater than that incorporated into your firm’s bid.” Bonamarte wrote that his determination to award the contract to the lowest joint bidder was based on commitment letters executed by the City and the Utilities, under which the City would award the contract to the over-all lowest bidder, but would "pay as its share only the lowest price for City [W]ork that was contained in any responsive and responsible bid.” Under the commitment letters, the Utilities would pay the City the difference between the price of the lowest bidder for the City Work, i.e., the petitioners, and the City Work portion of the lowest joint bid (the Differential).[6] Accordingly, Bonamarte concluded, the City "receives all the benefits incident to joint bidding as well as the lowest price for its work obtained through competitive sealed bidding.”
Contentions
Petitioners contend that they were the lowest responsible bidders for the City Work portion of the contracts, and accordingly the contracts should have been awarded to them under General Municipal Law § 103 (1), which states in relevant part: "Except as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, nineteen hundred fifty-three, all contracts for public work involving an expenditure of more than twenty thousand dollars * * * shall be awarded by the appropriate officer, board or agency of a political subdivision or of any district therein * * * to the lowest responsible bidder furnishing the required security after advertisement for sealed bids in the manner provided by this section * * * Such officer, board or agency may, in his *885 or its discretion, reject all bids and readvertise for new bids in the manner provided by this section.” Petitioners acknowledge that General Municipal Law § 103 (1) provides that a municipality may "bypass” a lowest responsible bidder in accordance with laws adopted prior to September 1, 1953. But they deny that the City respondents had authority to bypass under New York City Charter § 313 (b) (2), which Bonamarte cited in his letters to petitioners, and which respondents now invoke as grounds for the bypass. That section of the Charter, which governs the City’s competitive sealed bidding procedures, provides: "The agency letting the contract may reject all bids if it shall deem it for the interest of the city so to do; if not, it shall, without other consent or approval, award the contract to the lowest responsible bidder, unless the mayor shall determine in writing, justifying the reasons therefor, that it is in the best interest of the city that a bid other than that of the lowest responsible bidder shall be accepted. Such determination shall be filed with the procurement policy board and published in the City Record.” (NY City Charter § 313 [b] [2].) In support, petitioners cite Matter of Seabury Constr, Corp. v Department of Envtl. Protection (160 Misc 2d 87 [Sup Ct, NY County 1994]), which held that the Mayor’s bypass authority as provided by New York City Charter § 313 (b) (2) is invalid because the authority was transferred from the Board of Estimate to the Mayor in 1989 under the new New York City Charter. As a result of Seabury, petitioners claim, respondents are collaterally estopped from asserting that the City can bypass.
Judlau also claims that alleged "postbid” negotiations between the City and the Utilities, pursuant to which the Utilities agreed to pay the Differential, are unlawful because they determined who would be awarded the contracts. Diamond makes two additional points: (1) the City’s requirement that the lowest bidder on the City Work must also be the lowest joint bidder to win the contract constitutes an illegal precondition on the award; and (2) the Differential payment by the Utilities constitutes an invalid adjustment of petitioners’ submitted bids by applying a standard that is not specified in the bid documents.
In opposition, the City respondents contend that the contractors chosen by the City were the "lowest responsible bidder[s]” under General Municipal Law § 103 (1). Even if petitioners are deemed to be the lowest responsible bidders, the City respondents argue, the City is authorized to bypass them under New York City Charter § 313 (b) (2). The City respondents insist *886 that they are not collaterally estopped by Seabury (supra), and cite Matter of HHM Assocs. v Appleton (157 Misc 2d 759 [Sup Ct, NY County 1993]) in support: in the context of a prebid challenge to the same joint bidding arrangement at issue here, the court in HHM held that the bypass provision in New York City Charter § 313 (b) (2) was valid. The City respondents deny that the Joint Bidding Agreement or the Utilities’ agreement to pay the Differential subverts competitive bidding, or that the joint bidding arrangement imposes any illegal precondition on bidders. Finally, the City respondents contend that the bid proposal documents notified petitioners how the winning bidder would be determined.
As justification for the joint bidding arrangement set forth in the JBA, respondents detail its benefits for the City. Logically, respondents point out, the City Work and the Utility Work on a project should be performed by the same contractor; this will eliminate the need to coordinate different contractors’ work and reduce delay and waste. Until recently, however, the Utility Work was not included as part of the project contract. Consequently, respondents claim, serious delay occurred when successful bidders to City contracts then negotiated with the Utilities to enter into separate contracts for the Utility Work. Respondents add that the informal arrangement under which the Utilities pay the City the Differential ensures that the City receives the best price for the City Work.
Respondent Cobar, which was awarded one of the project contracts for which Diamond bid, contends that Diamond should have challenged the joint bidding procedure before participating in it, and accordingly has waived its right to object.
Discussion
The motion by the Utilities for leave to intervene in these proceedings is granted. The Utilities have a direct interest in the outcome of these proceedings: they are designated as third-party beneficiaries in the Joint Bidding Agreement, which would be impossible to implement if the court.were to hold that the joint bidding arrangement specified in the public works contracts in question is invalid. (See, Matter of HHM Assocs. v Appleton, supra, 157 Misc 2d, at 763 [granting utilities leave to intervene in challenge to joint bidding arrangement].)[7]
Turning to the merits of the dispute, the court shall first address whether, as respondents contend, the lowest joint bid *887 ders for the project contracts were the "lowest responsible bidder[s]” under General Municipal Law § 103 (1). That position lacks any merit. The statute unequivocally states that the "lowest responsible bidder” shall be awarded "contracts for public work”, i.e., work done on behalf of the City and citizenry. The Utility Work included in the project contracts is not "public work”; the Utility Work directly benefits and is on behalf of privately owned Utilities, and any benefit to the City is indirect. To claim that bidders to project contracts are not "responsible” under General Municipal Law § 103 (1) merely because they fail to submit the lowest joint bids begs the question as to whether considering the Utility Work price in awarding the contract is legal under General Municipal Law § 103 (1). (See, Matter of HHM Assocs. v Appleton, supra, 157 Misc 2d, at 767, 769-770 [City’s award to the lowest responsible joint bidder instead of the lowest responsible bidder on City Work portion of project would violate General Municipal Law § 103 (1) "lowest bidder” rule].)
The next issue is whether Seabury (supra) collaterally estops respondents from claiming that the City exercised a valid bypass. Seabury in effect held that the bypass provision in New York City Charter § 313 (b) (2), which Bonamarte invoked in his letters to petitioners and on which respondents rely here, is invalid.[8] In reaching this conclusion, the court in Seabury acknowledged that two prior cases "appear to have addressed” the issue: United States v City of New York (799 F Supp 1308 [ED NY], affd 972 F2d 464 [2d Cir 1992]) and Matter of HHM Assocs. v Appleton (157 Misc 2d 759, supra). (Matter of Seabury Constr. Corp. v Department of Envtl. Protection, supra, 160 Misc 2d, at 93.) The court in Seabury found United States inapposite, because it did not "address the core issue in this proceeding”: whether the Mayor’s authority to bypass the lowest responsible bidder is invalid because that authority was transferred from the Board of Estimate to the Mayor in 1989. (Supra.) The Seabury court acknowledged that the issues raised in HHM were "substantially similar” to those in Seabury, and that the HHM court held that "the City continued to possess the bypass power under the New Charter despite the transfer *888 of the bypass authority [in 1989]”. (Supra, at 94.) However, the Seabury court found that "that aspect of the [HHM] court’s opinion dealing with the transfer of the bypass authority is dictum”, because the petitioner in HHM brought its action before the contract bidding commenced, and the City had not as of yet awarded the contract to other than the lowest responsible bidder. (Supra.)
This court disagrees with the characterization of HHM’s analysis as dictum, in that the HHM court’s finding that the bypass authority continued was dispositive of the case: the court denied the petition, with leave to renew in the event the City awarded the project contract to "anyone other than the lowest bidder on the City [W]ork without complying with [New York City Charter § 313 (b) (2)]”. (Matter of HHM Assocs. v Appleton, supra, 157 Misc 2d, at 770.) That direction by the court was premised on the transfer of the Board of Estimate’s bypass authority to the Mayor.
Inasmuch as the HHM holding is dispositive and contrary to Seabury’s, this court is confronted with conflicting precedent with respect to the validity of the bypass authority.[9] For that reason alone, respondents are not collaterally estopped by Seabury (supra). (See, Restatement [Second] of Judgments § 29, comment f.)[10] Moreover, collateral estoppel is inapplicable because the Seabury, HHM and Trocom decisions (supra) are decisions of courts of coordinate jurisdiction with this court, and no appellate court has ruled on the issue. Finally, collateral estoppel rarely if ever applies to pure questions of law, which is the case here. (See, American Home Assur. Co. v International Ins. Co., 219 AD2d 143, 147 [1st Dept 1996].)
Accordingly, the court shall address the validity of the bypass procedure set forth in New York City Charter § 313 (b) (2). After reviewing the statutory framework, this court is persuaded that the bypass procedure is valid for the reasons set forth in HHM (supra, 157 Misc 2d, at 767-769) and Trocom *889 (supra, at 23, col 1). This court shall summarize here the HHM court’s well-reasoned analysis:
New York City Charter § 313 (b) (2) is a recodification of prior Charter provisions which authorized bypasses, and accordingly falls within the ambit of pre-1953 procurement procedures exempt from the "lowest bidder” requirement. These provisions date back to 1897, when the New York City Charter was enacted by the State Legislature. The 1897 Charter vested bypass authority in the Board of Public Improvements, which could bypass by a majority vote. In 1938, bypass authority was transferred to the Board of Estimate, which by a two-thirds vote could exercise a bypass. In 1989, after the Supreme Court of the United States, in New York City Bd. of Estimate v Morris (489 US 688 [1989]), had declared the Board of Estimate unconstitutional because it violated the principle of one person, one vote, the City adopted a new Charter which abolished the Board of Estimate and transferred its bypass authority to the City’s executive branch. The 1897, 1938 and 1989 City Charter bypass provisions are based on the same principle: under certain conditions, the municipality is empowered to award public works and procurement contracts to other than the lowest bidder. That the bypass power has passed from a group (the Board of Public Improvements and then the Board of Estimate) to a single official (the Mayor) is not significant. It is the continuity of the bypass authority as an executive power that is dispositive, not who exercises it.
Professor Eric Lane of Hofstra University Law School and New York Law School also cogently argues in favor of the continued validity of the bypass authority in The Sorrows of Seabury or How Not to Read a Statute (1 City L 73 [Oct. 95]). The author served as counsel and executive director of the New York City Charter Revision Commission from 1987-1989 and as Chair of the Mayor’s Task Force on Charter Implementation in 1990. Examining the legislative history of General Municipal Law § 103 (1), Lane writes that it: "tells us that the intention of the legislature in enacting GML § 103 (1) was not to override preexisting municipal procurement systems * * * In other words, whether the procurement decision was made by a Mayor, a Board of Estimate or a local legislature did not concern the legislature * * * This was a political decision to favor local choices by grandfathering existing procurement procedures. From this perspective, the most reasonable reading of [GML § 103 (1)] is that it exempts from coverage all municipalities with preexisting procurement systems.” (1 City L, op. cit., at 79.)
*890 Accordingly, the court finds that the Mayor or his designees retain a valid bypass authority. The remaining issues petitioners raise all relate to whether that authority was lawfully exercised in these proceedings.[11]
With respect to Judlau’s claim that the Utilities’ agreement to pay the Differential unlawfully enables them to determine who will be awarded the contract, the court adopts the reasoning of the court in Trocom, which addressed the identical issue: "The court is aware of the petitioners’ concerns over the respondents’ reliance on the informal reimbursement agreement as justification for bypassing petitioners’ low bids, a situation in which, petitioners claim, the Utilities will be able to pick and choose the contractors with whom they want to work. According to the petitioners, it is possible that in some circumstances the Utilities might decide that they do not want to pay the difference between the public work bids, in which case, allegedly, the situation envisioned in HHM might come to pass, and a contractor be awarded a city contract in which its bid on the public work far exceeds that of the lowest responsible bidder. In such a case, the Mayor or his deputy would have to establish reasonable grounds why the award of the contract to such a bidder was in the City’s best interest which might, or might not, be difficult to accomplish, considering the other arguments the City has raised in favor of its [Jjoint [Bjidding [Ajgreement. However, that situation does not arise in the present matter and should not be addressed until it does. In the present case, the Mayor has been promised reimbursement for the difference in the public work bids, and the public will not be penalized as a result.” (Trocom Constr. Corp. v Giuliani, supra, at 23, cols 1-2.)
Petitioners’ remaining contentions lack merit. The joint bidding procedure, and award criteria set forth in the JBA do not impose an illegal precondition to the award of a contract to the lowest responsible bidder. Rather, they establish criteria under which a legal bypass under General Municipal Law § 103 (1) will be exercised. Finally, the extent to which petitioners were apprised of the joint bidding arrangement, the award criteria under the JBA and Differential payments by the Utilities is irrelevant if the City lawfully exercised its bypass *891 authority. In any event, this court agrees with the court in Trocom that: "There is no direct indication in the bid or contract documents of the existence of the [JBA], or of the [agreement to pay the Differential], and the City’s intention to award the contracts to the lowest overall bidder is never stated precisely, beyond * * * language * * * stating that the bids will be compared on the basis of the total estimated price for the contract. However, the intention to award the contract on the basis of a comparison of bids is implied in the language * * * and appears to be the only logical reason for its inclusion. Therefore, it appears that notice is contained in the bid proposal and other documents.” (Trocom Constr. Corp. v Giuliani, supra, at 23, col 2 [emphasis added].)
As a final point, it is noted that petitioners were entitled to challenge the joint bidding arrangements and did not waive that right by participating in the bidding. In HHM (supra), leave was given petitioner to renew its challenge after the bid in the event that the City awarded the project contract to anyone other than the lowest bidder on the City Work without complying with New York City Charter § 313 (b) (2); such leave would have undoubtedly been given here.
For the reasons set forth above, it is ordered and adjudged that the applications of petitioners are denied and the petitions are dismissed.

. Two other consolidated proceedings involving identical issues of law were determined by Justice Stanley L. Sklar in favor of the municipal respondents. (Trocom Constr. Corp. v Giuliani, NYLJ, Aug. 1, 1996, at 22, col 3 [Sup Ct, NY County].)

. Both petitioner Judlau Contracting, Inc. (Judlau) and petitioner Diamond Asphalt Corporation (Diamond) bring suit against the City of New York (the City), Mayor Rudolph W. Giuliani, Chief City Procurement Officer Richard M. Bonamarte, City Comptroller Alan G. Hevesi and DOT Commissioner Elliot G. Sander. Additionally, Judlau sues City Procurement Policy *882 Board Chairman Brendon Sexton, and Diamond sues the DOT and DOT Chief Contracting Officer Peter M. Syrdahl.

. Judlau bid on a contract for the reconstruction of the Hunts Point Area of the Bronx. The City awarded the contract to Grace Industries, Inc. (Grace). Diamond bid on three different contracts for the reconstruction of: (1) 9th and West 9th Streets, Brooklyn; (2) the Brookville Boulevard Area, Queens; and (3) the Ozone Park Area, Queens. The City awarded these contracts to, respectively: Tully Construction Company, Inc. (Tully); Cobar Construction Company, Inc. (Cobar); and Grace.
Petitioners bring suit against the successful bidders to the contracts in question, as well as against the City respondents.

. The identical language contained in the Special Notice to Bidders also appeared at section 4 (G) of each of the contracts submitted to the prospective bidders.

. The breakdown of the bids was as follows:
Hunts Point Area: Judian: $17,005,196.34 for City Work; $2,659,652 for Utility Work; $19,664,848.34 total; Grace: $17,050,851.34 for City Work; $1,682,578.26 for Utility Work; $18,733,429.60 total.
*884 9th and W. 9th St.: Diamond: $9,941,598.29 for City Work; $5,617,432.25 for Utility Work; $15,559,030.54 total; Tally: $10,901,051.36 for City Work; $938,892.25 for Utility Work; $11,839,943.61 total.
Brookville Blvd.: Diamond: $7,119,258.79 for City Work; $2,880,741.20 for Utility Work; $9,999,999.99 total; Cobar: $7,267,144.17 for City Work; $60,513 for Utility Work; $7,327,657.17 total.
Ozone Park: Diamond: $11,719,261.28 for City Work; $4,002,452 for Utility Work; $15,721,713.28 total; Grace: $12,758,585 for City Work; $488,054 for Utility Work; $13,246,639 total.

. The requirement that the Utilities pay the Differential is not found in the Joint Bidding Agreement.

. The Utilities join in the City respondents’ contentions.

. Seabury (supra) specifically invalidated 11 RCNY former 3-09, which authorized City agencies to refer certain contract bids by minority-owned and woman-owned business enterprises to the Mayor "or such other official as may exercise such power” for consideration for a bypass under New York City Charter § 313 (b) (2). Although the court in Seabury does not explicitly hold the section 313 (b) (2) bypass provision invalid, that conclusion is the inescapable consequence of the decision.

. The court in Trocom sided with the analysis in HHM (supra) and upheld the validity of the bypass authority. (Trocom Constr. Corp. v Giuliani, NYLJ, Aug. 1, 1996, at 23, col 1, supra.)

. "Giving a prior determination of an issue conclusive effect in subsequent litigation is justified * * * by underlying confidence that the result reached is substantially correct. Where a determination relied on as preclusive is itself inconsistent with some other adjudication of the same issue, that confidence is generally unwarranted * * * That such a doubtful determination has been given effect in the action in which it was reached does not require that it be given effect against the party in litigation against another adversary.” (Restatement [Second] of Judgments § 29, comment f.)

. The court notes that, under New York City Charter § 313 (b) (2), the Mayor’s decision to exercise the bypass is not unrestricted: the Mayor must publish an explanation of his decision to bypass in the City Record. The court’s analysis of the bypasses’ legality is premised on the assumption that the Mayor will fulfill this requirement.