OPINION OF THE COURT
Bellacosa, J.
 Two interrelated law questions are presented on this appeal. Does private utility interference work constitute “public work” under General Municipal Law § 103 (1), when municipalities determine the “lowest responsible bidder” by combined assessment of amounts bid for utility interference work and street reconstruction work? Additionally, in satisfaction of General Municipal Law § 103 (1), does bypass contractor selection authority survive solely as the Mayor’s responsibility, under revised New York City Charter § 313 (b) (2)? We answer both questions in the negative.
Petitioner Diamond Asphalt Corp. sued to annul the award of certain public works contracts to competitors. Affected utility companies moved to intervene in the lawsuit. Supreme Court granted the intervention, denied annulment of the contracts, and dismissed the lawsuit. The Appellate Division affirmed. This Court granted Diamond leave to appeal and we now reverse and grant declaratory relief only.
*249 L
This case involves the legal classification and public works nature of reconstruction work on New York City streets in conjunction with related utility interference work. It is undisputed that private utility companies serving the City and its residents have a practical and historic statutory and common-law obligation to pay all costs associated with protecting their facilities during street repair projects; these obligations include the removal, protection and relocation of their utility equipment (see, Administrative Code of City of NY § 19-143 [b]; § 24-521 [b]; see also, Matter of Consolidated Edison Co. v Lindsay, 24 NY2d 309, 316; New York Tel. Co. v City of Binghamton, 18 NY2d 152, 159-160; Transit Commn. v Long Is. R. R. Co., 253 NY 345, 351). This unique obligation is a precondition to the “privilege” to use City streets for the purpose of installing and maintaining utility equipment (Transit Commn. v Long Is. R. R. Co., supra, 253 NY, at 351).
It is further undisputed that until 1992, utility interference work was considered private work and was separately contracted for by the utility companies. The process worked generally as follows: the City would select the lowest bidder contractor to perform the necessary street reconstruction work and then notify affected utility companies, who would in turn hire their own contractors to perform the related utility work. The utility interference work was not included in the public works contract between the City and its selected contractor; the agreement between the latter was, as customary, governed by the “lowest responsible bidder” restrictions.
According to the arguments of the City and the utilities before us, this arrangement resulted in lengthy delays to public improvement projects and inflated costs to utility companies. They explain that affected utility companies would customarily contract with the City’s contractors, who often submitted artificially low bids to the City, expecting to adjust and recoup from the utility companies with respect to profits or losses resulting from the low bid used to win the contract.
Related to the matter at hand, the City entered into a joint bidding agreement in 1992 with Con Edison, New York Telephone, and Empire City Subway. The joint bidding agreement covers City construction projects “mutually agreed upon” between the City and the utility companies. Under the arrangement, the City solicits bid specifications for all aspects of the work involved in a public project, including utility interfer *250 ence work. The City issues a “Special Notice to Bidders” which advised bidders that work for various utilities is included in the contract, and that the contractor is responsible for all utility work affecting the utility facilities.
Under the agreement, the City is required to award the contract to the contractor submitting the lowest aggregate bid, irrespective of the discrete costs associated with the formerly public work street portion alone. The City is obliged to pay the successful contractor for the entire project, including the necessary utility interference work. The utility companies, in turn, must reimburse the City for the amount allocated by the contractor for the utility interference work. Additionally, the utilities must pay the City a pro rata portion of the contractor’s enumerated general expenses and a 5% administrative charge.
Importantly, the accepted over-all low bidder is often not the lowest bidder for the City’s share of the work; rather, the rejected bids include lower amounts for City reconstruction work. This is what occurred in the instant case — Diamond submitted the lowest bid on the City work portion alone, but its discrete portion for utility interference work bumped Diamond above the lowest bid in the aggregate.
The aggregate bidding arrangement does not fully protect against scenarios which may be potentially adverse to the taxpayers. For example, the agreement does not require utilities to reimburse the City for the difference between the accepted over-all low bidder’s higher price for public street work and the lowest bid received for City work. Therefore, under the formal aggregate bidding agreement, the City may be required to accept a bid for the traditional public work which is not the “lowest” bid, solely because the aggregate bid spreads out as an over-all lowest bid.
The City rationalizes its acceptance of bids for City work which are not the “lowest” bids, by reference to what it has termed “commitment letters.” These postbid letters, appended to the specific transactions challenged in this proceeding, were sent by the New York City Department of Transportation to the various utility companies. In the respective letters, the Roadway Engineering Bureau informs the utilities that the subject contract will be awarded to the named contractor. The letters add that the cost of the utility’s share of the work includes a “pro-rated adjustment based on the difference between the overall low bidder’s price for the City’s share of the work and the lowest price received on the City’s share of the *251 work.” The respective utilities are required to sign and return an attached duplicate copy of the letter in order to confirm acceptance of this informal payment rearrangement. Critically, these letters, which make no reference to the joint bidding agreement, were sent after the bids were solicited and after they were made public. Therefore, the utilities had an opportunity to learn the composition of the bids before accepting the added obligations proposed by the City in the informal side addendum. In fact, the “commitment letters” stated the actual differential for which the City sought reimbursement.
IL
In 1996, the City solicited public bids on three reconstruction projects for streets in Brooklyn and Queens. Prospective bidders were provided with proposed contracts for each project. They included a “Special Notice to Bidders” which expressly provided that “[t]he Contractor is responsible for all Utility Work for the affected Utility Facilities and shall be paid by the City for such work based on the prices bid.” The bid schedule required each contractor to state separate amounts for each of the itemized bid components, which expressly included specifications for utility interference work, in addition to the gross sum for the entire work project.
Appellant Diamond submitted a substantially higher over-all bid compared to those submitted by other bidders. Diamond, however, submitted the lowest bid on the traditional public street work portion of each contract. The high utility work portion of its bid raised its aggregate bid above the competing bids. The City awarded each contract to the lowest aggregate bidder for the corresponding project.
Thereafter, the City Chief Procurement Officer informed Diamond by letter that it was not selected. Candidly, the respective letters for each of the contracts stated as follows:
“Pursuant to Section 313 (b) (2) of the New York City Charter and Section 3-02 (u) of the Procurement Policy Board (PPB) Rules, a City agency letting a contract by competitive sealed bidding shall award the contract to the lowest responsive and responsible bidder, unless the Mayor determines that it is in the best interest of the City that a bid other than that of the lowest responsive and responsible bidder be accepted. The Mayor has delegated this authority to the City Chief Procurement Officer.
*252 “In the matter of the above contract let by the Department of Transportation (DOT), I have determined that it is in the best interest of the City to award the contract to * * * a firm that is the overall lowest responsive and responsible bidder for the combined City and Utility interference construction work, although the price allocated * * * to the City’s work is greater than that incorporated into your firm’s bid” (emphasis added).
He added that the selection was “based on” the agreement reached in the “commitment letters executed by the City and the utility companies.”
In this format, the City expressly invoked its bypass authority in awarding the respective contracts to contractors that were not the lowest bidders for the City public street portion of the work (see, City Charter § 313 [b] [2] [when a contract is awarded to other than the lowest bidder, notice must be given to the lowest bidder]). Significantly, this diversionary exercise of the award was not explicitly based on the theory the City now advances — that private utility work may be defined as “public work” for purposes of lowest bidder assessment in public works contracts, when conjoined with the purely public street work.
Diamond immediately commenced this CPLR article 78 proceeding challenging the City’s selection of other contractors. It sought a preliminary injunction to prevent the certification of the let contracts. The municipal respondents opposed in all respects and moved to dismiss the petition. In the interim, intervenor-respondent utility companies entered the case and joined the effort to dismiss the petition.
Supreme Court denied preliminary injunction relief and granted the motions to dismiss. Supreme Court held that the utility interference work in each contract was not “public work” within the meaning of General Municipal Law § 103 (1) and, thus, the City could not consider the amount bid by each contractor for utility interference work in the aggregate as a method to determine which contractor was the “lowest responsible bidder” under that statute. Justice Freedman summarized as follows:
“The statute [ ] unequivocally states that the lowest responsible bidder’ shall be awarded ‘contracts for public work,’ i.e., work done on behalf of the City and citizenry. The Utility Work included in the *253 project contracts is not ‘public work’; the Utility Work directly benefits and is on behalf of privately-owned Utilities, and any benefit to the City is indirect. To claim that bidders to project contracts are not ‘responsible’ under GML § 103 (1) merely because they fail to submit the lowest joint bids begs the question as to whether considering the Utility Work price in awarding the contract is legal under GML § 103 (1)” (citing Matter of HUM Assocs. v Appleton, 157 Misc 2d 759).
Nonetheless, Supreme Court held that the Mayor enjoys a “bypass” authority, pursuant to Charter § 313 (b) (2), to award contracts to higher bidders.
The Appellate Division affirmed (238 AD2d 197). The court agreed that “the Mayor possesses and lawfully exercised his bypass authority under New York City Charter § 313 (b) (2) in awarding the contracts to bidders who, although not the lowest bidders on the public work portion of the contracts, were the lowest bidders on both the public work and utility interference portions in the aggregate” (id., at 198). The court reasoned that “[t]he exercise of such authority did not violate General Municipal Law § 103 (1), since bypass authority was established prior to September 1, 1953 and was merely revised and restated upon its transfer to the Mayor when the Board of Estimate was abolished” (id.).
In addition, and contrary to Supreme Court’s holding, the Appellate Division upheld the joint bidding agreement protocol, finding that “examination of the ‘ “total character of the arrangement” ’ convinces us that the utility interference work called for in the contracts did constitute ‘public work’ within the meaning of General Municipal Law § 103 (1)” (id., quoting Matter of Citiwide News v New York City Tr. Auth., 62 NY2d 464, 472).
m.
We first address two threshold matters. While this injunctive proceeding is moot because the work under the contracts at issue is completely or substantially done, we are satisfied that we should convert this proceeding into a declaratory judgment action (see, CPLR 103 [c]; Matter of Lewis Tree Serv. v Fire Dept., 66 NY2d 667, 669). Conversion is prudent and appropriate in this case because the issues presented by Diamond effectively constitute a clear legal challenge to the validity of the relatively new and pervasive public bidding regimen being used by the City.
*254 A question also has been raised concerning nonpreservation. Diamond contends that the City and the intervenor respondents argued only for the first time to the Appellate Division that “interference work” is “public work.” Diamond argues that the City made this argument in response to the trial court’s analysis, and that consequently the Appellate Division erroneously considered and ruled on this additional basis for affirming the dismissal of the lawsuit.
The City, in response, points to the assertion in its answer that “[e]ach of the contracts which are the subject of this proceeding was awarded to the lowest responsible bidder in accordance with General Municipal Law § 103.” It urges that this statement sufficiently alerted its adversary and the trial court to its over-all claim that utility interference work constitutes “public work” in this “combined” work and bidding ritual.
We are satisfied that the public work argument is sufficiently preserved under these unusual circumstances, since both courts plainly ruled on it, and everyone was manifestly aware of its potential significance.
IV.
Turning to the merits, Diamond argues that utility interference work does not constitute “public work” under General Municipal Law § 103 (1) because utility work is inherently private and solely benefits utility companies. Diamond urges that municipalities may not consider the discrete amounts bid for utility interference work and City street work in the aggregate to determine which bidder is the “lowest responsible bidder” on a contract for public work. Rather, it suggests that the City must choose the lowest bidder on the public portion of the work, as it did before 1992 when the bidding arrangements were kept separate.
Both the City and the utilities, in turn, contend that utility interference work may be fitted into the statutory framework of “public work.” Initially, they propose that utility interference work included in City contracts is “public work,” which is itself subject to competitive bidding requirements under City Charter § 310 (1). They note that section 310 (1) mandates competitive bidding by the City for projects paid with moneys under the control of or collected by the City. Additionally, they propose that utility work constitutes “public work” because it is functionally inseparable from the street reconstruction work and has public consequences. Their theory is interwoven with policy considerations, essentially that aggregate bidding *255 calculations eliminate the potential third-party haggling over costs between contractors and utilities, which may cause extensive delays in the completion of work covered by contracts between the City and contractors.
The governing statute is General Municipal Law § 103 (1). It provides that all contracts for “public work” must be awarded to the “lowest responsible bidder.” Neither the statute nor legislative history provide a definition of “public work.” Therefore, in determining whether traditional private utility work may be deemed and converted into “public work” for purposes of General Municipal Law § 103 (1), it is useful to examine the nature of the public bidding process in precedential context. This Court from time to time has been called upon to determine whether a particular contract constitutes “public work.” In making these rulings, the Court has articulated and applied the purposes of the competitive bidding statutes.
Matter of Signacon Controls v Mulroy (32 NY2d 410), for example, held that a contract to provide a county-wide fire alarm reporting system fell within the “specific wording” and “spirit” of General Municipal Law § 103 (1) (id., at 412, 414). The Court reasoned as follows:
“The agreement made between the county and [a private company] also opens the door to fraud, corruption, and favoritism, albeit there is no sign of such a situation in the case at bar. One of the purposes of the competitive bidding statutes is to eliminate the opportunity for fraud, favoritism or corruption by office holders. And no matter how one views this agreement, it is still a public contract given to a private contractor without competitive bidding. A wayward public official could use the secrecy and ambiguity inherent in any agreement not requiring public advertising and bidding to do great mischief.” (Id., at 415 [citations omitted].)
The Court concluded that “[t]o exempt this type of agreement from the competitive bidding requirements of section 103 of the General Municipal Law would allow public officials to do indirectly what they cannot do directly” (id., at 416). We cautioned that “[s]uch an exemption would make it quite simple for most sellers and public officials, who wish to avoid the statute’s requirement, to adopt an ‘arrangement’ whereby the governmental unit would pay no money but would be used *256 as a rental or percentage conduit through which a seller could make large profits without having to subject his wares and price to the salutary effect of competitive bidding” (id.).
Next, in Matter of Exley v Village of Endicott (51 NY2d 426), the Court reviewed “whether a municipality violated [General Municipal Law § 103], when it did not offer competitors of the New York Telephone Company the opportunity to bid for the right to provide the municipality with certain telephone terminal systems” (id., at 429). The petitioners there argued that “the modern tariff system under which the equipment was to be provided rendered the transaction the functional equivalent of a sale, and brought it within the strictures of the competitive bidding statute” (id.).
The Court in Exley began its analysis by noting that section 103 of the General Municipal Law must be read in conjunction with the underlying purpose set forth in Signacon — to “safeguard the public interest” by “invit[ing] competition, and discouraging] favoritism, improvidence, extravagance, fraud and corruption” (id., at 431). The Court noted, however, that “it also must be recognized that competitive bidding statutes constitute a substantial imposition on the activities of municipal governments,” and thus the Court should “not extend the coverage of the statute into areas unintended by the Legislature” (id. [emphasis added]).
The Court in Exley held that “the acquisition of the phone system [could not] without contextual strain be classified as a public work contract” (id.). The Court reasoned that “the installation of the system was not a substantial aspect of the contract, and the contract did not otherwise involve performance of services or specialized skills” (id.). Moreover, although the agreement had attributes of both a lease and a sale, the Court looked to the “total character of the arrangement” and concluded that the agreement was not a “purchase contract” within the scope of the competitive bidding statute because the transaction was “in the nature of a true lease” (id., at 432-433).
Matter of Citiwide News v New York City Tr. Auth. (62 NY2d 464, supra) builds the precedential instruction, in relation to Public Authorities Law § 1209 (1). That statute provides that a contract for “public work in excess of a specified cost may be entered into by the [Transit Authority] only after competitive bidding procedures have been followed” (id., at 468). The issue in Citiwide was whether a license agreement, focusing primarily on the operation of newsstands in the New York City *257 subway system, was subject to competitive bidding requirements where the agreement provided that the licensee must improve and rehabilitate existing facilities on the property (id.). In Citiwide News, an unsuccessful applicant for the license argued that the maintenance and improvement provisions of the license agreement rendered the agreement a contract for “public work” and thus subjected it to competitive public bidding requirements (id., at 468-469). The Court rejected this theory and held that the subject there was not “public work.”
The Court found it “appropriate to look to the ‘total character of the arrangement’ in determining whether the master license, having attributes of both a typical license and a public work contract, falls within the scope of the competitive bidding statute” (id., at 472, citing Matter of Exley v Village of Endicott, 51 NY2d 426, supra). We concluded that “Notwithstanding the fact that an indirect expenditure of public money [was] involved, the Authority was not required to follow competitive bidding procedures before making the contract, inasmuch as the ‘total character of the arrangement’ [was] clearly that of a license agreement for the maintenance and operation of newsstands and not that of a ‘contract for public work’ ” (id., at 470). Therefore, the issue in Citiwide was whether the contract as a whole was even subject to competitive bidding procedures.
Notably, the Court stated that neither the Public Authorities Law (at issue there) nor General Municipal Law § 103 (at issue here) “offers any definition of ‘contract for public work’ or otherwise indicates the specific nature of the contracts falling within the public bidding requirement” (id.). The Court determined, however, that the expenditure of public money is a factor to be weighed (id.). We stated: “‘A contract which provides for a lesser income to a governmental unit than a competing contract might provide, is an “expenditure” within the meaning of [the competitive bidding statute]”’ (id., at 471, quoting Matter of Signacon Controls v Mulroy, 32 NY2d 410, 416, supra). Emphatically, this Court reiterated its “expressed concern [in Signacon) that public officials not be permitted to do indirectly what they may not do directly, and that the salutary purposes of the public bidding statutes not be evaded by merely altering the nature of an arrangement to bring it technically outside the scope of the requirements” (id.). This admonition cogently directs the analysis and informs the disposition of the instant case.
Furthermore, the Court in Citiwide stressed that, in ascertaining the reach of public bidding requirements, it is *258 important to ensure “full compliance with such statutes, which have as their aims the elimination of extravagance and improvidence, as well as prevention of the opportunity for fraud, favoritism or corruption in the awarding of public contracts” (id., at 472, citing Matter of Signacon Controls v Mulroy, 32 NY2d 410, 414-415, supra). The Court again cautioned, on the other hand, that “[bjalanced against this important policy * * * is the equally important recognition that competitive bidding requirements impose a substantial restriction upon the activities of public entities and must be extended no further than reasonably contemplated by the Legislature” (id., citing Matter of Exley v Village of Endicott, 51 NY2d 426, 431, supra). A key factor of this overview is that the Legislature is uniquely invested with the responsibility of definition as to who and what are covered. It would be unwise to shift such power into the engine and control of the regulated municipality, solely through its chief executive branch officer or designee.
Most recently, in Matter of AT/Comm, Inc. v Tufo (86 NY2d 1), the issue was “whether the New York State Thruway Authority was required to seek public bids, under Public Authorities Law § 359, for installation of a provisional electronic toll-collection service [E-ZPass]” (id., at 4). The petitioner there argued that the electronic toll collection system installed by NYSTA constituted an “improvement” of the Thruway within the meaning of Public Authorities Law § 359, thus mandating public bidding (id., at 5). The Court concluded that the contract did not require public bidding (id., at 4). The Court reasoned that “[t]he aim of the E-ZPass system was not to improve the roadway but to improve the flow of traffic on it” (id., at 6).
The Court acknowledged that under Citiwide it is necessary to examine “the ‘total character of the arrangement’ to determine whether the projects under review fall within the ambit of competitive bidding statutes” (id.). In applying this standard, we again stressed the need to consider the underlying purposes of the public bidding statute (see, id.). The Court concluded that the nature of the contract there was more similar to a “procurement” contract — one “for the acquisition of goods or services” (id., at 6-7). Therefore, in defining and applying “public work” concerns, this Court has always preeminently emphasized that the values underlying the competitive bidding process must not be violated.
*259 V.
A.
The rationales in our precedents substantially pave the way for our conclusion that private utility work does not constitute “public work” in this case. We have bound the courts to construe public bidding statutes strictly in order to encourage, participate in and enforce the achievement of the stated objectives of the Legislature. The Legislature has in no way indicated an intention or authorization for the. City to unilaterally and informally determine, define and alter the contours of “public work” matters. Quite to the contrary, the purposes of the competitive bidding process are placed in jeopardy when a municipality is permitted to unilaterally alter the terms of the accepted process. To be sure, this Court has more than once cautioned against allowing public officials to “indirectly” circumvent public bidding policies and prescriptions by “Lego-like” rearrangements of the pieces of traditional contractual relationships and obligations (see, Matter of Citiwide News v New York City Tr. Auth., 62 NY2d 464, 471, supra; Matter of Signacon Controls v Mulroy, 32 NY2d 410, 416, supra). The means to the end are important, as is the need to subject the whole and the pieces of the transaction to careful scrutiny, especially in light of this Court’s firm admonitions about protecting a fastidious bidding process.
The City concedes that utility work, prior to the creation of the joint bidding technique in 1992, did not constitute “public work.” The City essentially argues then that the joint bidding agreement and the side addendum with the utilities effected a transformation of this part of such work projects and its scope into “public work.” We disagree. Practical and unilaterally perceived policy objectives, however desirable, cannot bring about that legal conversion by endorsement from the courts— only the Legislature is empowered to effect policy-driven changes of this magnitude. Irrespective of the asserted “integration” aspect of the public contracts, and any direct, incidental or indirect benefits to the City derived from aggregate bidding, the nature of the utility work remains unchanged — it is private, and for the essential benefit of a private entity.
Notably, the Legislature has exercised its appropriate power in analogous circumstances. For example, in the Gas Facility Cost Allocation Act (GFCAA), the Legislature authorized the City to enter into agreements with gas utilities to share the *260 costs of gas line interference work necessary to perform water and sewer projects (GFCAA, L 1988, ch 357, § 4, reprinted in McKinney’s Cons Laws of NY, Book 47, Public Service Law § 66, at 164). The statute provides for joint bidding for water and sewer projects (GFCAA, L 1988, ch 357, §§ 4, 5 [3], reprinted in McKinney’s Cons Laws of NY, Book 47, Public Service Law § 66, at 164, 166). Conversely, the “Wicks Law” expressly precludes joint bidding (General Municipal Law § 101). It mandates “separate and independent bidding” for enumerated portions of the required work (General Municipal Law § 101 [2]). The City and dissent urge that merely because the Legislature has expressly made joint bidding a part of the cost-sharing scheme in other contexts does not indicate that the City cannot unilaterally implement joint bidding without legislative involvement in circumstances such as are presented here. The cited legislative parallels cogently demonstrate that these bidding schemes must be authorized by the Legislature, not devised and implemented by the municipalities on their own.
Additionally, the dissent attempts to distinguish the GFCAA by arguing that “[t]he agreements at issue in this case do not contemplate a cost-sharing scheme;” rather, utility companies remain responsible for the cost of interference work and “for the difference between the actual cost of the reconstruction portion of the contract and the low bid submitted for that work” (dissenting opn, at 271, 272, n). To the contrary, critical reliance on the informal letters is very troublesome, due to the possible playouts under which the City would be left to absorb the cost of a higher bid for street reconstruction work.
Assuming that this Court were to sanction the City’s novel reorganization of the contractual relationships and responsibilities, this would be the first judicial approbation in theory and as applied; the holding would invest the City with unusual authority for these public bidding agreements. The authorization for this unconventional and unlimited process could thus become the template for all future multimillion dollar dealings. That sweeping consequence would contradict this Court’s express warnings and pertinent prohibitions, and its respectful acknowledgment of the distinctive legislative prerogatives governing this area of governmental authority.
B.
Furthermore and appropriately, we are concerned that the City’s creative formulation, including the side letter agree *261 ments between the City and the private utility companies, could “open[ ] the door to fraud, corruption, and favoritism, albeit there is no sign of such a situation in the case at bar” (Matter of Signacon Controls v Mulroy, 32 NY2d 410, 415, supra). The values associated with the competitive bidding process are seriously jeopardized by informal arrangements which permit one party to unilaterally alter the terms or conditions of the agreement. These concerns are not unfounded “dire predictions” (dissenting opn, at 272), but rather rest on the realistic wariness taught by this Court’s undeviating precedents.
For example, the City argues that there is no additional expenditure of public money as a result of the joint bidding scheme (see, Matter of Signacon Controls v Mulroy, 32 NY2d 410, 416, supra [“A contract which provides for a lesser income to the governmental unit than a competing contract might provide, is an ‘expenditure’ within the meaning of section 103.”]). Its argument is premised on the “commitment letters,” by which the utility companies agreed to reimburse the City for the differential between the lowest bid for City work and the cost of City work in the accepted lowest joint bid. We perceive a considerable hole in this purported security blanket, both legally and practically.
As noted, this “agreement” was not made part of the formal joint bidding agreement and does not even reference it. Rather, the letter exchange is an informal postbid addendum, entered into by separate parties (the City and the utilities). Thus, utility companies are given an opportunity to review the accepted bid and the differential in the constituent parts of the bid before signing onto the side-bar letter. This appendage is inherently contradictory to the public bidding process and provides an open invitation to manipulation and other temptations. Allowing an informal, postbid agreement between the City and a private company to affect or dictate the public bidding regularities between the City and its contractor is bad policy, bad law and may even be bad business, though that is not a direct concern or within the expertise of the courts.
Curiously, if the utilities were to refuse to “commit” to the informal postbid proposition or thereafter flatly refuse to reimburse the City for the difference between the public work bids, it is unclear how, if at all, the City would enforce reimbursement for the differential, except perhaps through litigation or other dispute resolution mechanisms. In this eventuality, the City might end up awarding a City contract to a contractor who submitted a bid on the public work portion which far *262 exceeds that of the lowest responsible bidder for City work, ultimately to the detriment of the taxpayers. This example demonstrates the uncertainty and inappropriateness of the City’s proposed reinforcement of its scheme. Notably, the “commitment letters” are only pertinent to the instant case, and thus the future of this over-all process is even more unclear because the formal agreement allows for the acceptance of a bid for City work that is demonstrably not the “lowest,” possibly leaving the public fisc holding the bag.
The dissent urges that “on the facts before us there is no sign of any evil at work in this case, nor does the Court identify any” (dissenting opn, at 272-273). The dissent disregards, however, this Court’s definitive declaration that there need not be fraud or even a “sign” of fraud in a particular case; rather, the competitive bidding statutes are intended to guard against the “opportunity’ for fraud (Matter of Signacon Controls v Mulroy, 32 NY2d 410, 415, supra). In our view, the comprehension of how the agreement in the instant case “opens the door to fraud” is plain to see (id.). The dissent instead would accept the City’s agreement for reimbursement as an acceptable practice “memorialized” in the commitment letters (dissenting opn, at 268-269). We are wary of giving these commitment letters such legitimatizing force and justification.
Moreover, even assuming the existence of a provision in the joint bidding agreement which attempts to protect against the unlawful expenditure of public funds by requiring reimbursement for any differential, the City’s scheme still falters because it improperly allows the City to unilaterally allocate and direct the funds obtained and paid during the public bidding process. That fundamentally alters the nature of the process. Pushing the envelope to its extreme, the City goes even further in the joint bidding agreement by agreeing to consult with the utilities regarding bids. The agreement between the City and the utilities states: “[t]he City agrees to consult with the Companies as to what constitutes an excessive or unbalanced bid and as to what action the City, in its discretion, should take in the event of the submission of an excessive or unbalanced bid.”
Providing private companies with such an interactive, consultative role in the public bidding process is contrary to the generally above-the-board nature of the process. The General Municipal Law and this Court’s precedents forbid or should deter the City from playing with such fire. Otherwise, the process could be manipulated by private, investor-owned, profit-seeking third-party companies, such as utilities and *263 contractors, perhaps in collaboration against the interests of the City.
C.
The dissent further urges that the entire scheme in the instant case is one for “public work” solely because, in its view, “the total character of the arrangement is of a ‘public work’ nature” — i.e., utility interference work is “incidental” to and a “necessary component” of street reconstruction projects (see, dissenting opn, at 270). We believe that the dissent has omitted a vital part of the requisite analysis.
Although the “total character of the arrangement” test has been used by this Court to determine whether a particular contract is a public works contract, in each application the Court has stressed the importance of ensuring that the underlying purposes of the competitive bidding statutes are not violated — i.e., that there is no potential for fraud and that the Legislature’s objectives are complied with. In AT /Comm, Citiwide and Exley, the Court confidently concluded that there was no potential for fraud and that the Legislature had not intended to include such contracts within the ambit of the respective public bidding statutes. The Court in each case, therefore, determined that the competitive bidding requirements did not apply at all.
The situation in the instant case is quite different. Here, there is an obvious potential for fraud and the Legislature has in no way indicated an intent to allow such informal bidding agreements to trump the public bidding process. The core of the subject transactions here are public works and are unquestionably subject to public bidding requirements under the General Municipal Law. The wide twist in the analytical road and precedential path then is whether the City may unilaterally transform the well-settled public bidding process by devising an informal scheme, whereby the City may accept a bid from a contractor that is not the “lowest” bid for City reconstruction work or “public work,” by artfully combining traditionally public work with formerly undisputedly private work to arrive at an enlarged public work project.
Under the City’s and the dissent’s proposed theory, anything could be deemed a public work simply by including it in a public work contract. Indeed, the essential character of this arrangement was merely the joinder of bids for the purely private work with those for the public work. That cannot as a matter of law convert, as the dissent suggests, what has historically *264 been considered substantial private work into public work. As evidenced by the City’s requirement that bids be apportioned between the utility interference and the street reconstruction work, and more importantly by the fact that the City did not expend funds for any portion of the utility work, both the private and the public parts of the project manifestly remained separate and distinct.
The public bidding process must be protected from creative efforts by a municipality, as here, to skate around the process, however well intentioned the City’s policy, fiscal or practicality grounds.
VL
Having concluded that utility interference work does not constitute “public work,” we must now address the alternative ground invoked by both lower courts to sustain the City’s actions. We believe that bypass authority, under New York City Charter § 313 (b) (2), is not continued in these circumstances under General Municipal Law § 103 (1) (i.e., transferred from the defunct New York City Board of Estimate to the Mayor alone).
Prior to 1989, bypass authority was vested in the Board of Estimate under a different Charter provision. That Board was abolished after its structure was found unconstitutional by the United States Supreme Court (see, New York City Bd. of Estimate v Morris, 489 US 688). Thereafter, in 1989, Charter § 313 was approved by New York City voters. It granted procurement powers to the Mayor and specified City agencies. Charter § 313 (b) (2) provides that:
“The agency letting the contract may reject all bids if it shall deem it for the interest of the city so to do; if not, it shall, without other consent or approval, award the contract to the lowest responsible bidder, unless the mayor shall determine in writing, justifying the reasons therefor, that it is in the best interest of the city that a bid other than that of the lowest responsible bidder shall be accepted.”
The dispute in the instant case springs out of General Municipal Law § 103 (1). It clearly provides that all contracts for “public work” must be awarded to the lowest responsible bidder, “[e]xcept as otherwise expressly provided by an act of the legislature or by a local law adopted prior to [Sept. 1, 1953].”
Diamond argues that because Charter § 313 (b) was passed by the electorate in 1989, it constitutes a law adopted after *265 September 1, 1953 and thus cannot qualify under the local law exemption set forth in General Municipal Law § 103. The City retorts that Charter § 313 (b) is a mere “revision, simplification, consolidation, codification or restatement” of a preSeptember 1, 1953 local law and, as such, fits within the explicit reservation of power under the General Municipal Law.
Diamond points to Matter of Seabury Constr. Corp. v Department of Envtl. Protection (160 Misc 2d 87), which found that General Municipal Law § 103 renders the Mayor’s bypass authority invalid. In Seabury, the court concluded that the New Charter is not a “ ‘mere revision, simplification, consolidation, codification or restatement’ ” of the Old Charter (id., at 95). The court stated that “although the bypass authority continued in the New Charter is in theory the same as that contained in the Old Charter, the fact that the decision-making process with respect to such authority has been transferred from the Board of Estimate to the Mayor alone represents a significant departure from the balance of power originally provided for under the Old Charter” (id.). The court reasoned that “[u]nder the Old Charter, the bypass authority could only be triggered by a ‘super majority’ vote of the Board of Estimate,” whereas “the New Charter vests the power to implement the bypass authority in a single individual, namely the Mayor or the Mayor’s appointee” (id.).
The City relies on trial court authority which concludes that “§ 313 (b) of the current Charter retains its viability after the recodification of the Charter in 1989 and may, for purposes of GML § 103, be considered a local law adopted prior to September 1, 1953” (Trocom Constr. Corp. v Giuliani, NYLJ, Aug. 1, 1996, at 22, col 3, at 23, col 1; see, Matter of HHM Assocs. v Appleton, 157 Misc 2d 759, 767, 769, supra [but concluding that “the Joint Bidding Agreement might well result in a violation of the ‘lowest responsible bidder’ rule”]; see also, United States v City of New York, 799 F Supp 1308, affd 972 F2d 464). This theory is based on the rationale that both Charters were based on the same principle: “under certain conditions, the municipality is empowered to waive the ‘lowest bidder’ rule” (Matter of HHM Assocs. v Appleton, supra, 157 Misc 2d, at 769; see, Trocom Constr. Corp. v Giuliani, supra, NYLJ, Aug. 1, 1996, at 23, col 4 [“(i)t is the continuation of the bypass power, rather than who may exercise it, that is critical”]). Finally, the State Comptroller has opined that “the Legislature [did not intend] to preclude a charter law adopted after September 1, 1953 which is essentially a mere revision, simplification, *266 consolidation, codification or restatement of a pre-September 1, 1953 special law or local law” (1981 Opns St Comp No. 81-109, at 111).
The Legislature has not.classified Charter § 313 as a mere “revision, simplification, consolidation, codification or restatement” of the Old Charter. We do not believe it can be so easily labeled since it effects a substantive power reallocation with substantive legal effects and dispensative avoidance of generally applicable and important regulatory and fiscal principles. The transfer of bypass authority from the Board of Estimate to the Mayor would represent a major shift in the balance of authority originally provided for under the defunct Charter. Therefore, we hold the view that to override the plain language of the General Municipal Law, an express or definitive declaration would be required to establish that the Legislature intended to continue and transfer bypass authority of such sweeping proportions and nature, as is presented in this case, solely to the chief municipal executive or designee.
Even assuming Charter § 313 constitutes a mere revision or recodification, neither this Court nor the Legislature has seen fit to answer the second step of necessary analysis — that such enactments fit within the General Municipal Law exception. That determination would also demand some express action or more reasonably definitive direction by the Legislature. We see none. Finally, it is wholly unpersuasive to buttress this claim of a unilateral authority shift on the fallback ground that the Mayor is nevertheless subject to scrutiny by public notification requirements and judicial review under CPLR article 78.
Since the respective rationales offered by the City and intervenors, and employed by the Appellate Division and the Supreme Court, do not sustain the validity of the City’s actions and legal position in this case, we reverse and grant relief to Diamond only insofar as declaring the bid selection process unauthorized and unlawful.
Accordingly, the order of the Appellate Division should be reversed, with costs, the proceeding converted to a declaratory judgment action and judgment should be granted declaring that the bid selection procedures at issue violate General Municipal Law § 103 (1).