OPINION OF THE COURT
Walter B. Tolub, J.
This is a CPLR article 78 proceeding by which the petitioners, a group of contractors and their trade association, seek to prevent the respondents City and related entities from advertising, awarding or registering some 20 or so contracts for public infrastructure work on the grounds that the contracts contain an illegal specification, namely “Section U”. Empire City Subway Company, Limited, New York Telephone Company and Consolidated Edison have sought to intervene and that application is granted. The Alliance for Downtown New York has been permitted to serve an affidavit by its president in support of the City’s position.
This is only one in a series of battles undertaken by the City of New York to combat what everyone, except the petitioners, perceives as the inordinate delays and outrageous costs attending infrastructure projects where “interference work” is required. A brief explanation and history is in order.
When the City undertakes infrastructure projects such as the repaving of streets or installation of water mains and sewers, arrangements must be made for the protection of or relocation of pipes, conduits, wires, and the like owned by utilities which would otherwise interfere with the City work. Privately owned utility companies maintain surface and subsurface facilities in the streets of New York City pursuant to franchises granted by the City. These facilities include gas pipelines and conduits containing wires for electrical power, telephone and cable communications. Pursuant to statute, the utilities themselves are responsible for relocating or protecting the interfering utility facilities (Interference Work) when requested by the City. Historically, the City’s practice has been to issue “Order Out Notices” to the companies whose facilities presented interference with a City project. An Order Out Notice typically required the company to make its own arrangements for the necessary Interference Work. A company receiving an Order Out Notice from the City may (1) perform the required Interference Work with its own employees and equipment, (2) *387 retain a separate construction company to perform the Interference Work, or (3) negotiate a separate agreement with the City’s contractor to perform the Interference Work in coordination with its work under the City contract.
As detailed by Chief Judge Kaye in her dissenting opinion in Matter of Diamond Asphalt Corp. v Sander (92 NY2d 244, 267-268), the companies typically elect to negotiate an Interference Work agreement with the City’s contractor, rather than bringing a separate workforce into a construction site occupied and controlled by the City’s contractor. However, because of the monopoly position occupied by the City’s contractor, the negotiations have often been difficult and time-consuming, and have regularly imposed excessive costs and have caused major delays in important City projects, with the impact of the delays and costs falling on the public.
Experience has shown that when City infrastructure contracts do not require the City’s contractor to perform the Interference Work, and instead rely on the use of the Order Out procedure, City projects often experience major delays, additional costs and inconvenience for businesses and residents, caused by disputes between the City’s contractor and the companies over what Interference Work is necessary, by what means and for what price.
In 1992, the City, by its account, seeking to eliminate unnecessary delays, uncertainties and costs surrounding street reconstruction projects, entered into a “Joint Bidding Agreement” with Consolidated Edison, New York Telephone and Empire City Subway. The Agreement provided that for certain City construction projects (mutually agreed upon between the City and the utility companies which were parties to the Agreement), the necessary utility interference work was to be included in the public contracts when they were let out for bid. The City was then required to award the contracts to the lowest responsible bidder for the entire project — including both the construction work and the utility interference work. Under the terms of the Agreement, the City had to pay the successful contractors for the entire project, including the necessary utility interference work, and in turn the utility companies were required to compensate the City for the bid amounts attributable to the utility interference work, plus a contract administration charge of 5%.
Pursuant to the Agreement, in 1996 the City invited bids on three street reconstruction contracts. The specifications notified bidders that utility interference work had been included in *388 contracts and that the bids would be compared on the basis of total aggregate price. What resulted was a challenge to the bidding protocol, the Diamond Asphalt case (supra).
In Diamond Asphalt, the IAS Court dismissed the petition (Diamond Asphalt Corp. v Sander, 171 Misc 2d 879). Justice Freedman found that although utility work included in the contracts was not public work within the meaning of General Municipal Law § 103 (1), and that the City could not consider the amount bid by each contractor for utility interference work in the aggregate to determine the lowest responsible bidder, nonetheless the Mayor enjoyed a “bypass” authority pursuant to New York City Charter § 313 (b) (2) which permitted him to award contracts to a higher bidder upon a finding that to do so was in the best interests of the City. The Appellate Division affirmed (Matter of Diamond Asphalt Corp. v Sander, 238 AD2d 197). It agreed that the Mayor had bypass authority, but also upheld the joint bidding agreement protocol, finding that the utility interference work under the circumstances presented constituted public work. This set the stage for the Court of Appeals.
Judge Bellacosa in a comprehensive analysis of the relevant statutes and case law (Matter of Diamond Asphalt Corp. v Sander, 92 NY2d 244, supra) concluded that (1) private utility interference work does not constitute “public work” under General Municipal Law § 103 (1) and that municipalities may not combine utility interference work and street reconstruction work to determine the lowest possible bidder and (2) that the Mayor did not have bypass contractor selection authority under the new City Charter. The Court of Appeals accordingly reversed and voided the joint bidding protocol.
The City, undaunted by this reversal, moved on two fronts. First it sought to introduce new legislation to amend General Municipal Law § 103 to permit the joint bidding protocol struck down in Diamond Asphalt (supra) and secondly it introduced a new protocol, contained in Section U of contracts for City construction, where utility interference work was anticipated.
SECTION U
Section U refers to the standard interference work specifications produced by the City’s Department of Design and Construction which was to be incorporated into those infrastructure projects where there is a potential for interference work to cause significant delays, additional cost or other adverse impacts. That specification is now contained in some 20 contracts.
*389 Section U provides for the following:
(1) It informs all bidders that specified utility companies operate surface and/or subsurface facilities which impact on the productivity of the City work called for in the contract, and that the companies have already provided information about the quantities and locations of such facilities, as well as standard details and methods for supporting, protecting, and/or working around such facilities. In short it notifies bidders of the existence of known interference work and what is required to protect these facilities.
(2) It further informs all bidders that the City will not compensate the City’s contractor for any costs related to interference work, but that, upon award of the contract the City’s contractor will be required to commence immediate negotiations with the utility companies whose facilities may impact on the City work to attempt to reach agreements with these companies under which the companies shall compensate the contractor for the Interference Work.
(3) Section U provides that if the contractor and any company fail to conclude a necessary interference agreement within four weeks after award of the City’s contract, the contractor must submit the dispute with the utility company to expedited binding arbitration. Section U also provides for a similar expedited binding arbitration process in the event that once in construction the contractor identifies interferences not previously identified by the companies, and for which no preconstruction agreement exists.
(4) Section U informs all bidders that the affected companies have already made prior agreements with the City to negotiate such interference agreements with the City’s contractor and, if necessary, to submit the negotiations to binding arbitration as provided in Section U.
petitioners’ objections
We begin our discussion with the observation that the New York State Constitution (art IX, § 2 [c]) permits municipalities to adopt and amend local laws relating to their property, affairs and government, that General City Law § 19 extends that power to the management and regulation of their property and that General City Law § 20 grants the express power to deal with roadways and the like. The City Charter (§ 1202) in turn delegates the incidental powers to the Department of Design and Construction. Most significantly the delegated powers include not only those expressly conferred but those required *390 by necessary implication to accomplish legislative goals (Matter of Mercy Hosp. v New York State Dept. of Social Servs., 79 NY2d 197). Thus it is incumbent on the petitioners to demonstrate to this court that either the respondents have exceeded those delegated powers or violated an existing statute or case law.
The petitioners claim that (1) Section U is illegal in that it combines public and private work in violation of the Court of Appeals holding in Matter of Diamond Asphalt Corp. v Sander (92 NY2d 244, supra); (2) Section U is invalid in that it is violative of Administrative Code of the City of New York § 24-521; and (3) Section U is invalid in that it violates General Municipal Law § 100-a which requires the City to pay the lowest possible cost for public work.

DIAMOND ASPHALT

At the outset this court is of the opinion that the Court of Appeals opinion in Diamond (supra) does not invalidate any of the provisions of Section U. Diamond Asphalt dealt with the concept of joint bidding, and the proposed protocol does not impact on the bidding process. The bid selection process in Diamond Asphalt was flawed because it permitted a composite contract of City work (public work) and interference work (private work) to be awarded to the responsible contractor submitting the lowest aggregate bid for the combined work. (92 NY2d, at 249-250).
In the instant case the parties are free to negotiate or arbitrate. The evils perceived by the Court of Appeals in Diamond (supra) do not come into play here because the City simply is not involved in the negotiating process between the utilities and the contractors. The objectionable provisions of Section U, requiring contractors to perform interference work, and mandatory arbitration are similarly not impacted by Diamond.
There is nothing in the Diamond Asphalt opinion (supra) to lead this court to believe that the court intended to change the long-standing practice which permits the City to require contractors to perform utility work (see, Necaro Co. v Eighth Ave. R. R. Co., 220 App Div 144; Di Menna & Sons v City of New York, 114 NYS2d 347), or to prohibit public entities from including alternate dispute resolution agreements in contracts let to private contractors (Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp., 87 NY2d 927).
Of greater concern to this court, is the petitioners’ claim that Section U is invalid in that it imposes an invalid precondition *391 for bidding on the public work. More specifically, as a condition to bidding the contract, the contractor will be required to perform the public interference work. Setting aside for purposes of discussion that in an overwhelming majority of the contracts the City lets the contractor perform the utility interference work, is this nonetheless a valid precondition?
A bidding “precondition” is not unlawful per se. A precondition is invalid if it (1) impedes competition and (2) bears no rational relationship to obtaining the best work at the lowest price (Matter of New York State Ch., Inc., Associated Gen. Contrs. v New York State Thruway Auth., 88 NY2d 56, 67-68).
The petitioners have cited a number of cases in which preconditions for bidding have been stricken where localities have utilized ordinances, Mayor’s orders and the like to promote social policymaking (see, Associated Bldrs. & Contrs. v City of Rochester, 67 NY2d 854 [equalizing minimum labor costs]; see also, Subcontractors Trade Assn. v Koch, 62 NY2d 422 [promoting business opportunities in a depressed area]; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344 [discrimination based on sexual orientation]; Boreali v Axelrod, 71 NY2d 1 [smoking in public places]). These clearly were instances where the bid preconditions have no relationship to obtaining the best work at the lowest price.
In contrast Section U does not impede competition. It applies equally to all bidders, does not disqualify any class of bidders, does not favor any bidder over another and does not predetermine that a certain bidder will be awarded a City contract.
Moreover, what the petitioners fail to recognize is not only is the proposed protocol not in derogation of statute or case law, it has been demonstrated that it promotes the very purpose of General Municipal Law § 100-a to “[A]ssure the prudent and economical use of public moneys for the benefit of all the inhabitants of the state and to facilitate the acquisition of facilities and commodities of maximum quality at the lowest possible cost” (emphasis supplied).
The court has examined the other claims regarding precondition and regards them of no merit.
THE CONTRACT AND THE ADMINISTRATIVE CODE
The petitioners claim that the contract would relieve the utilities of their statutory responsibility to perform interference work by shifting the obligations of the utilities to the City and the City contractor.
*392 It is well established that utility companies have an absolute duty pursuant to statute and common law to remove, protect, replace, shift, relocate and alter their facilities whenever required by the public health, safety or convenience (see, New York Tel. Co. v City of New York, 95 AD2d 282; Matter of Consolidated Edison Co. v Lindsay, 24 NY2d 309).
There is no requirement that the utilities themselves perform utility interference work and indeed it is uncontroverted that the City’s contractors traditionally performed the utility interference work associated with most of the City’s projects. There is nothing contained in this agreement that relieves the utilities’ obligation to otherwise protect their facilities, and indeed this court’s reading of the contract reveals that Section U provides a modality for getting the job done, getting the contractors paid and proceeding expeditiously.
Most importantly Section U, although it places restraints on the contractors and the utility companies, specifically reserves to the City the ultimate right to compel performance. Paragraph 9 specifically provides that, “nothing in this Section shall preclude the City from exercising its rights under the Law to issue such a directive (‘order outs’) to the Company.”
THE REQUIREMENT THAT THE CITY PAY THE LOWEST POSSIBLE COST FOR PUBLIC WORK
The final argument advanced by the petitioners is that by requiring the contractors to negotiate with the utilities for interference work, the costs to the public will increase. Petitioners argue that contractors will shift all of their financial contingencies to the public work thereby increasing costs and violating the mandate of General Municipal Law § 100-a that the City pay the lowest possible cost. The court rejects this argument.
In the first instance the City’s actual experience in the period of joint bidding on 34 contracts let was that the award prices for the contracts averaged 89% of the City Engineer’s estimate.
Additionally the court notes that in only two of the 23 projects were there any delays attributable to interference work. How much public money was saved in these projects is incalculable.
But assuming arguendo that the bidding process does not produce the lowest possible cost, is price the only consideration? Clearly it is not.
*393 As the Court explained in Matter of Construction Contrs. Assn. of Hudson Val. v Board of Trustees (192 AD2d 265, 267-268): “Slavish attention to financial considerations alone, is, of course, not required. Municipalities may fix reasonable standards and limitations on products and services, even if they tend to favor one bidder over another by their operation, provided that the public interest is served and not compromised thereby (see, Gerzof v Sweeny, 16 NY2d 206, 211; Matter of McNutt Co. v Eckert, 257 NY 100). On the other hand, General Municipal Law § 103 is violated by bid requirements which reduce competition for reasons which do not inure to the benefit of the public”.
This court is convinced that based on past experience there has been no demonstrated shifting of cost so as to violate General Municipal Law § 100-a, and that the public interest is served and the public will be benefitted by the implementation of the procedures contained in Section U.
For all of the above reasons the petition is dismissed, the applications for injunctive relief denied and the stay vacated.