[696 NYS2d 155]

In the Matter of GENERAL CONTRACTORS ASSOCIATION OF NEW
YORK, INC., et al., Appellants, v LUIS M. TORMENTA, as
Commissioner of the New York City Department of Design
and Construction, et al., Respondents, and EMPIRE CITY
SUBWAY COMPANY, LIMITED, et al., Intervenors-
Respondents.

First Department, October 19, 1999

## APPEARANCES OF COUNSEL

*Steven I. Tolman* of counsel, New York City (*Alan Levy* on the brief; *Levy & Tolman,* attorneys), for appellants.

*Bob Bailey* of counsel, New York City (*Francis F. Caputo, Lewis S. Finkelman* and *George Gutwirth* on the brief; *Michael*

*D. Hess, Corporation Counsel* of New York City, attorney), for respondents.

*Guy Miller Struve* of counsel, New York City (*D. Scott Tucker* and *Gina Caruso* on the brief; *Davis Polk & Wardwell* and *Robert P. Slevin,* attorneys), for Empire City Subway Company, Limited and another, intervenors-respondents.

*Andrew J. Czerepak* of counsel, New York City (*Richard W. Babinecz,* attorney), for Consolidated Edison Company of New York, Inc., intervenor-respondent.

### OPINION OF THE COURT

Tom, J.

This appeal concerns the validity of a new provision, "section U," in New York City construction contracts. Section U is the latest device by the City to bring under control delays and attendant costs caused by disputes between City contractors and utility companies whose facilities must be relocated during City projects. Petitioners, seeking to enjoin the use of section U, are contractors who bid for public improvement projects put out for competitive bidding by the municipal respondents. Respondent Department of Design and Construction is the principal agency through which New York City carries out reconstruction projects, subject to competitive bidding, on its streets and aging water and sewer lines and other facilities. Such projects often require coordination with utilities and other entities to temporarily relocate their facilities, including gas pipes and electrical and communication conduits, on or under City streets. These facilities affect not only private commerce and residents, but also control traffic and overhead street lights, with correlating public safety ramifications. However, since this "utility interference" work involves the property of private entities, it is privately negotiated between the utilities and contractors. Although, historically, the City often required that the necessary relocations or alternative measures be performed by the City's contractors, it has always been done at the expense of the relevant utility (*see,* Administrative Code of City of NY § 19-143 [b]; § 24-521 [b]; *Matter of Diamond Asphalt Corp. v Sander,* 92 NY2d 244, 249). Various of these utility companies (Empire City Subway Company, New York Telephone Company and Consolidated Edison) intervene as respondents on behalf of the City's position in support of the new provision.

Prior to 1993, contractors performing City-awarded contracts enjoyed significant leverage against the utility companies in

negotiating utility interference work. When a dispute arose with a utility, the contractor would often request time extensions for performing the City project, avoiding economic injury to itself and passing the consequences of delay along to the City and the utility company. The City then would often minimize its own inconvenience by issuing a "work out" notice (Admininistrative Code § 19-143 [b]; § 24-521 [b]) directing the utility company, at its own expense, to immediately relocate the particular pipeline, conduit or other facility, although there is some indication in the record that delays, nonetheless, continued. The difficulty faced by the City is that utility interference work has been subject to abuse and delays by contractors over the years, with all the additional ramifications that delays have on local residents and commercial interests, including traffic and pedestrian inconveniences. There also are indications that dissatisfied contractors occasionally threatened or carried out shutdowns until their terms were met for conducting utility interference work (*see*, *Matter of Diamond Asphalt Corp. v Sander, supra*, at 267-268 [Kaye, Ch. J., dissenting]).

In order to employ greater control over major projects and reduce delays resulting from contractor/utility company disputes, the City, starting in 1993, experimented with a "joint bidding" process. The goal of this process was to identify potential interference work in advance, to make performance of the City contract more predictable and timely, and to better ascertain the costs of the interference work. The City apparently enjoyed significant success with joint bidding. However, this bidding regime was invalidated by the Court of Appeals in the *Diamond Asphalt* case, which held that such joint bidding violated General Municipal Law § 103 (1).

A brief explanation of joint bidding is necesary to illustrate how it differs in relevant ways from the current section U provision. Under joint bidding, the City's engineers, when preparing documents to be used in soliciting bids for major projects, consulted with the relevant utility companies to identify facilities affected by City projects and to ascertain effective strategies and their cost. In the "pre-engineering" phase of the bidding process, the City included any anticipated utility interference work, which eventually would be incorporated in the project specifications of the City contract. The bid documents jointly solicited bids for the City work as well as for whatever utility interference work was necessary, which, as noted, is non-City work. Rather than separating the private

work from the City work, though, the City awarded the contract to the contractor submitting the lowest aggregate bid. The City paid the contractor for both components of the work, and the utility company reimbursed the City for its respective utility interference work, plus a 5% administrative charge (*see,* discussion in *Matter of Diamond Asphalt Corp. v Sander, supra,* at 249-250). In order to avoid the City incurring an economic loss if a possible lowest bidder on City-only work was not the lowest aggregate bidder, utility companies, under this bidding procedure, also often agreed on an ad hoc basis to reimburse the City for the difference, if any, between the lowest bid on the City's own component of the project and the winning lowest aggregate bid (*Matter of Diamond Asphalt Corp. v Sander, supra,* at 250-251). However, this device ignored the fact that the lowest bidder on the City component of the project could not thus be assured of being awarded the contract if the expense of the private work was added to the bid. A lowest bidder on City work nevertheless might not have the lowest aggregate bid and would thus lose the contract.

The Court of Appeals, in *Diamond Asphalt,* concluded that joint bidding violated the mandate of General Municipal Law § 103 (1) that "all contracts for public work * * * be awarded * * * to the lowest responsible bidder" complying with applicable requirements and procedures. Moreover, the Court concluded that "[i]rrespective of the asserted 'integration' aspect of the public contracts, and any direct, incidental or indirect benefits to the City derived from aggregate bidding, the nature of the utility work remains unchanged—it is private, and for the essential benefit of a private entity" (*supra,* at 259) and cannot be part of the bidding process for City work.

In response to the *Diamond Asphalt* decision, the City, in consultation with utility companies, designed a new contract specification, "section U," which eliminated aggregate bidding but required the contractor to perform the necessary utility interference work. In the pre-engineering phase, the utility interference work is still anticipated and included in the City's contract specifications. However, contractors are directly paid by utility companies, with whom they directly negotiate, for the utility interference portion of the project. Moreover, the utility interference work is not incorporated into the bid, so that the erstwhile aggregate bidding procedure is eliminated and the contract is awarded to the lowest bidder for the City project in compliance with General Municipal Law § 103 (1).

Section U also requires the contractor to resolve, within four weeks of the award of the City contract, economic disputes

with a utility regarding utility interference work identified in the contract. For utility interference work not previously identified, and hence not included in the project specifications, any dispute occurring during ongoing construction must be promptly resolved. In either case, an unresolved dispute will be submitted to expedited and binding arbitration under the auspices of the American Arbitration Association (AAA). As such, both the utility and the contractor are encouraged to make reasonable final offers, the alternate dispute resolution process is expected to be more efficient and cost-effective than litigation, and the City is removed from the private dispute while, at the same time, this process ensures a speedy resolution.

Nevertheless, several contractors, in the present CPLR article 78 proceeding, challenged section U as impermissibly imposing preconditions to bidding on public projects that purportedly violate the General Municipal Law § 103 (1) mandate to award the contract to the lowest bidder. The challengers also contend that section U impermissibly shifts, by contract, to contractors the obligation to perform utility interference work imposed on utility companies by common law and Administrative Code § 24-521. Further, the challengers contend that section U still runs afoul of the *Diamond Asphalt* ruling. The City responds that as long as the cost of the utility interference work is arranged between contractors and utility companies and is not part of the bidding process, City contracts are not covering private work and may require contractors to perform the work in a prompt manner and provide for arbitration of disputes between contractors and utility companies.

The IAS Court, dismissing the petition, found that insofar as section U did not impact on the bidding process, and did not involve the City in negotiations between a contractor and a utility for the private component of the work, the concerns articulated in *Diamond Asphalt* were not implicated. Nor did the IAS Court read *Diamond Asphalt* as prohibiting the City's longstanding practice of requiring its contractors to perform utility interference work at the expense of the utility, or as precluding the City from including arbitration provisions in its contracts. Further, the court found that since section U does not impede competitiveness in the bidding process, it is not an invalid precondition for bidding for public work within the context of the General Municipal Law. Moreover, the court found that section U did not relieve the utility companies of

the obligation to pay for utility interference work, and thus does not violate the Administrative Code.

■ We agree. Initially, *Diamond Asphalt* only invalidated the post-1993 system of joint bidding, and did not address section U, which was not yet in use. Nor does the inclusion of section U in City contracts violate the general thrust of *Diamond Asphalt*. Section U does not provide for consideration of aggregate bids. It preserves the requirement of General Municipal Law § 103 (1) that the contract be awarded to the lowest responsible bidder for public work, and does not allow utility companies or others to interfere in the selection of the bid, a possibility that existed with joint bidding. Rather, section U clearly bifurcates the bidding process for public work, which remains the sole preserve of the City, from negotiations for utility interference work in which the City has no role. The City, in this latter regard, only retains the right to insist that its own contracts be timely performed and not made perpetually subject to maneuvering between contractors and the utility companies in their private dealings.

Joint bidding had allowed the pricing of the utility interference work, traditionally subject to negotiation between private parties, to be placed within the scope of the public bidding process. By contrast, section U returns such negotiations to the private sphere, where bilateral adjustments between contractors and utility companies in pricing for such work neither control the public bidding process nor are controlled by it. The pricing mechanism still remains " 'a matter for adjustment between the contractor and the [utility] company or companies concerned' " (*Necaro Co. v Eighth Ave. R. R. Co.*, 220 App Div 144, 146).

Section U continues the traditional practice whereby the City required successful bidders doing contract work for the City to also perform the utility interference work, albeit at the utility companies' expense. Petitioners contend that *Diamond Asphalt* implicitly prohibits the City from requiring its contractors to perform utility interference work. However, although provided with that opportunity to invalidate the City's longstanding practice in this regard, the Court of Appeals did not do so. Nor is this practice prohibited by Administrative Code §§ 19-143 or 24-521, which only codify the common law's imposition of the ultimate responsibility, and cost, on utility companies. Requiring its contractors to perform the necessary work, at rates to be negotiated with the utility companies, does not relieve the utility companies of their ultimate responsibility to ensure that the work is performed.

■ Petitioners also object to the City's elimination of access to judicial resolution of disputes between contractors and utility companies. Initially, there is nothing novel about directing that construction disputes be arbitrated rather than litigated in court. Section U ensures that the dispute will be resolved under AAA auspices—a fair, and fairly standard, practice. Moreover, this device merely requires that the contractor agree to an impartial dispute resolution mechanism for the very purpose contemplated by General Municipal Law § 100-a, that deadlocks costly to the City and the public at large be avoided. The legislative goal is to secure the best work at the best price in a timely manner while minimizing costs to the public and the City resulting from delays. That is the same goal advanced by section U. Since the arbitration clause advances the interests underlying the competitive bidding statutes, the addition of the clause to the contract is not a basis to invalidate it (*cf.*, *Matter of New York State Ch. v New York State Thruway Auth.*, 88 NY2d 56, 68, 74).

Petitioners further argue that section U creates uncertainty in total pricing for the project, subjecting contractors to possibly unanticipated costs in performing utility interference work, and thus encouraging contractors to increase their bids on the City work, somehow skewing what, for some contractors on some projects, otherwise might be bids sufficiently low to result in the contract award. This contention is clearly without merit. It bears repeating that the entire purpose of pre-engineering is to reasonably identify utility interference work and to ascertain costs in advance, so as to enhance, rather than defeat, predictability. Moreover, the very purpose of the provision requiring expedited and binding arbitration is to ensure not only that the utility interference work is timely performed, ensuring the public interest goal that the City contract will not thereby be delayed, but also that the contractor will be expeditiously and fairly paid.

The remaining points raised by petitioners are meritless.

Accordingly, the judgment of Supreme Court, New York County (Walter Tolub, J.), entered March 10, 1999, which, in a proceeding pursuant to CPLR article 78, denied petitioners' application for injunctive relief against municipal respondents' inclusion of addendum section U in public improvement contracts put out for competitive bidding by the City of New York, and dismissed the petition, should be affirmed, without costs. Appeal from order, same Court and Justice, entered on or about March 5, 1999, granting the same relief and directing

submission of a judgment, should be dismissed, without costs, as subsumed in the appeal from the judgment.

Motion to strike brief and other related relief denied.

NARDELLI, J. P., WILLIAMS, WALLACH and ANDRIAS, JJ., concur.

Judgment, Supreme Court, New York County, entered March 10, 1999, affirmed, without costs. Appeal from order, same court, entered on or about March 5, 1999, dismissed, without costs, as subsumed in the appeal from the judgment. Motion to strike brief and other related relief denied.